706 A.2d 1086

**William O. HARDY, et al.**

v.

**WINNEBAGO INDUSTRIES, INC. et al.**

**No. 1691, Sept. Term, 1996.**

Court of Special Appeals of Maryland.

March 12, 1998.

Robert D. Church, Upper Marlboro, for appellants.

Daniel C. Costello (Wharton, Levin, Ehrmantraut, Klein & Nash, P.A., on the brief), Annapolis, for appellee, Winebago.

Robert T. Cahill (Melanie D. Coates and McGuire, Woods, Battle & Boothe, L.L.P., on the brief), McLean, VA, for appellee, Ford Motor Co.

Argued before MURPHY, C.J., HOLLANDER, J., and GARY S. GASPAROVIC, Judge (Specially Assigned).

GARY S. GASPAROVIC, Judge, Specially Assigned.

William O. Hardy and Donna Hardy, the appellants, seek to recover the full purchase price of a motor home that they claim is defective. The appellees are Ford Motor Company, Inc., which manufactured the motor home's chassis, and Winnebago Industries, Inc., which manufactured the coach.

The Hardys filed an eight count complaint in the Circuit Court for Anne Arundel County against Ford, Winnebago, and Recreation World, Inc., the Annapolis dealership that sold them the motor home. Prior to trial, the court dismissed the counts alleging negligence and breach of the Automotive Warranty Enforcement Act.[1] A jury trial was then held and, at the close of the plaintiffs' case, the court granted the defendants' motion for judgment as to the remaining counts. The court thus rendered judgments in the defendants' favor on the Hardys' claims of breach of contract, breach of express war-

---

1. Md. Com. Law Code Ann. §§ 14–1501—14–1504 (1990 Repl.Vol.; 1996 Supp.).

ranties, breach of implied warranties of merchantability, breach of express warranties in violation of the Magnuson–Moss Warranty Act,[2] breach of implied warranties in violation of the Magnuson–Moss Warranty Act, and unfair and deceptive trade practices.[3]

## Issues

In this appeal, the Hardys argue, in essence, that

I. The trial court erred in granting the motion for judgment because they presented sufficient evidence to establish that they revoked acceptance of the motor home.

II. The trial court erred in granting the motion for judgment because they presented sufficient evidence that Ford and Winnebago breached their implied warranties of merchantability.

III. The trial court erred in failing to award them a full refund under the terms of the Magnuson–Moss Warranty Act, and

IV. The trial court erred in granting the motion for judgment because they presented sufficient evidence that Ford and Winnebago committed unfair and deceptive trade practices.

Because we find no merit in any of these arguments, we shall affirm the judgments of the trial court.

## Facts

William and Donna Hardy were the only witnesses presented at trial. Mr. Hardy testified that they purchased the motor home in July of 1993 for $38,989. The day after they got the motor home, the Hardys embarked upon a cross-country trip with their two young children.

---

**2.** 15 U.S.C.A. §§ 2301—2312 (1982; 1997 Supp.).

**3.** After trial, the Hardys settled their claim against Recreation World. Recreation World paid the Hardys $19,000 in exchange for the motor home, a release, and dismissal from this appeal. The Hardys seek to recover the balance of the purchase price from Ford and Winnebago.

Before they left Recreation World with the motor home, the Hardys noticed a crack in the windshield. The sales manager offered to repair the windshield. Mr. Hardy declined this offer, and the sales manager assured Mr. Hardy that Recreation World would fix the problem as soon as the family returned from its trip. The Hardys then proceeded on their way.

Initially, there were no problems. According to the Hardys' brief, "[w]hile passing through Wyoming on a Sunday evening, they heard a loud 'metal clanking' noise in the drive line." Mr. Hardy explained that he noticed that "as soon as you would engage the transmission [a]nd put it into drive and start co[a]sting forward then it sounded like just metal clinking together. It was pretty loud." Mr. Hardy called a toll-free number for Winnebago and a customer service representative directed him to take the motor home to a nearby Ford dealership. Mr. Hardy took the vehicle to the specified dealership the next morning. The service manager there told him that the drive shaft needed to be replaced. He did not have a drive shaft in stock and advised that it would take about a week to obtain one. After receiving the service manager's assurances that "it was okay to drive [the motor home] but the noise would just get worse and louder," Mr. Hardy decided not to wait.

In Oregon, the Hardys noticed a burning smell coming from the back of the motor home. Mr. Hardy looked under the vehicle and observed that "the drive shaft was glowing red hot and it was actually glowing red." He drove the motor home to the nearest Ford dealership and, because a mechanic did not work on the vehicle that day, the family spent the night in the parking lot. The next day, a mechanic readjusted the drive shaft. The burning smell disappeared, but the drive shaft still made noise. The mechanic informed Mr. Hardy that the motor home needed a new drive shaft. Again, the dealership did not have one in stock and estimated that it would take seven to ten days to get one. Mr. Hardy called Winnebago's toll-free line and obtained assurances that it would be safe to drive the vehicle to California. The customer service repre-

sentative from Winnebago made an appointment for the Hardys at a Ford dealership in California.

When they reached California, the Hardys took the motor home to the third Ford dealership. A transmission specialist checked it over but declined to perform any repairs. Mr. Hardy testified that he overheard the transmission specialist telling another mechanic that "once a problem like that gets in the [F]ord vehicle they can not correct it. And to just to tell the owner whoever it was to tell them to take it back to wherever they got [it] and let them worry about it." Mr. Hardy then called Winnebago's toll-free number and was told it was safe to drive the vehicle back home. He was further assured that if the vehicle broke down, Winnebago would come to get them.

The Hardys returned home in late August of 1993, after having put 7,500 miles on the motor home. The vehicle had about 2000 miles on it when the Hardys purchased it. Mr. Hardy took the motor home to Recreation World that same day because its temporary tags were about to expire and Recreation World had arranged for new tags. At that time, he gave the service manager a list of problems that needed repair. In addition to the drive shaft problem, he advised the service manager of problems with:

the windshield, the curtain clips, the clip for the door. We had asked for an extra set of keys for the back doors because they had (inaudible).

And um one of the front (inaudible) was leaking down the wheel. And um, one wheel cover blew off. There was a piece of molding (inaudible). The medicine door the mirror on the medicine door was cracked.

And um, the cover for the sink. And there is probably something else but I can't remember.

Mr. Hardy testified that he was told that the motor home would be repaired by September 18, 1993. On September 18, however, he was told that it would take another "week or so." The motor home was not ready in a week and, in October, Mr. Hardy learned that it had been taken to a Ford dealership for

repairs to the drive shaft. The Ford dealership returned the motor home to Recreation World in November.

Mr. Hardy went to Recreation World to test drive the motor home and discovered that "it still had the noise in the drive line." The service manager "kindda thought that they weren't gonna do anything else to [the drive shaft] but they would fix the rest of it. . . ." Mr. Hardy then sent a letter to Winnebago stating that he wanted a full refund for the motor home "[u]nder the provisions of the MARYLAND LEMON LAW." [4] He attached to the letter a list of 17 "problems that are taking Recreation World several months to repair." [5] Winnebago replied that it would not refund the purchase price but that it would make any necessary repairs.

In February of 1994, Recreation World contacted Mr. Hardy and informed him that "everything was repaired." Mr. Hardy went to Recreation World and determined that "of the list of 17 things that I had given them they repaired . . . um four or five items that had not been repaired and the drive line still had the noise in it." Mr. Hardy informed the service manager that he was dissatisfied but the service manager indicated that "they had done pretty much everything that they were gonna do with it." Mr. Hardy requested that Recreation World buy back the motor home but the service manager refused. Mr. Hardy then left without the motor home, indicating that he would let Recreation World know in a week what he planned to do about the matter.

Mr. Hardy obtained the services of an attorney and, in March of 1994, sent a letter "rejecting and/or revoking his acceptance" of the motor home to Recreation World. A copy of the letter was sent to Winnebago on that same date. Later

---

4. Maryland's Automotive Warranty Enforcement Act, Md. Com. Law Code Ann. §§ 14–1501—14–1504, is also known as the "lemon law." The trial court dismissed the count in the Hardys' complaint which accused the defendants of violating the Automotive Warranty Enforcement Act, and the Hardys do not appeal from that dismissal.

5. It is not clear from the record whether the list was admitted into evidence, and the parties disagree over the matter.

in March, a copy of the letter to Recreation World was also sent to Ford.

Before the plaintiffs rested their case, Mrs. Hardy testified briefly. In response to counsel's question, on direct examination, as to whether the value of vehicle to her had "changed after your trip out west," Mrs. Hardy responded: "It defi[nately] has gone down." [6]

Counsel for all three defendants then moved for judgment on all counts. The trial court granted the motions.

### Discussion

■ Maryland Rule 2–519(b) provides:

When a defendant moves for judgment at the close of the evidence offered by the plaintiff in an action tried by the court, the court may proceed, as the trier of fact, to determine the facts and to render judgment against the plaintiff or may decline to render judgment until the close of all the evidence. When a motion for judgment is made under any other circumstances, the court shall consider all evidence and inferences in the light most favorable to the party against whom the motion was made.

Where, as here, the trial is held before a jury, "other circumstances" exist and the trial court must "consider all evidence and inferences in the light most favorable" to the non-moving party. *Id. See also Pahanish v. Western Trails, Inc.,* 69 Md.App. 342, 353, 517 A.2d 1122 (1986). As we have explained:

In reviewing a trial court's grant of a motion for judgment in a jury trial, this Court must conduct the same analysis as the trial court, viewing all evidence in the light most favorable to the non-moving party.... Thus, we may affirm the grant of the motion for judgment only if, when considering evidence most favorable to appellant's claim, we

---

**6.** Mr. Hardy was also asked, on direct examination, whether "the value of the vehicle is [a]ffected or unaffected by the problems you allege in your complaint?" The court reporter notes in the transcript that his response was "inaudible."

conclude that there was insufficient evidence to create a jury question. . . .

*Martin v. ADM Partnership,* 106 Md.App. 652, 657, 666 A.2d 876 (1995) (citations omitted), *rev'd on other grounds,* 348 Md. 84, 702 A.2d 730 (1997).

## I

### Revocation of Acceptance

The Hardys first contend that the trial court erred by granting Ford's and Winnebago's motions for judgment as to the breach of contract claim "and all related Counts." The Hardys assert that they presented sufficient evidence to support a jury finding that they properly revoked their acceptance of the motor home.

Section 2–608 of the Commercial Law Article provides:

(1) The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it

(a) On the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or

(b) Without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

(3) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them.

The remedy of revocation of acceptance

lies only against a seller of goods, not against a remote manufacturer. This is so because the remedy, where suc-

cessful, cancels a contract of sale, restores both title to and possession of the goods to the seller, restores the purchase price to the buyer, and as fairly as possible, returns the contracting parties to the *status quo ante.* The remote manufacturer, having no part in the sale transaction, has no role to play in such a restoration of former positions. *Gasque v. Mooers Motor Car Co., Inc.,* 227 Va. 154, 313 S.E.2d 384, 390 (1984). *See also Alberti v. Manufactured Homes, Inc.,* 329 N.C. 727, 407 S.E.2d 819, 824 (1991); *Edelstein v. Toyota Motors Distributors,* 176 N.J.Super. 57, 422 A.2d 101, 104 (App.Div.1980).

■ There is no dispute that Recreation World, which is not a party to this appeal, sold the motor home to the Hardys. Citing § 2–314(1)(a) of the Commercial Law Article, the Hardys contend that Ford and Winnebago were sellers as well and were therefore subject to the revocation provisions of § 2–608. Section 2–314(1)(a) states: *"In §§ 2–314 through 2–318 of this title,* 'seller' includes the manufacturer, distributor, dealer, wholesaler or other middleman or the retailer...." (Emphasis added.) Sections 2–314 through 2–318 concern express and implied warranties. Thus, the definition set forth in § 2–314(1)(a) is expressly limited to the warranty provisions. *Cf. Copiers Typewriters Calculators, Inc. v. Toshiba, Corp.,* 576 F.Supp. 312, 322–23 (D.Md.1983) (explaining that the language of § 2–314(1)(b), that "[a]ny previous requirement of privity is abolished as between the buyer and the seller in any action brought by the buyer," applies only to actions brought under § 2–314).

The definition of "seller" for purposes of § 2–608 can be found in § 2–103. that section provides:

(1) In this title unless the context otherwise requires

. . .

(d) "Seller" means a person who sells or contracts to sell goods.

It is clear that Recreation World was the only seller of the motor home for purposes of § 2–608. Consequently, the action for revocation did not properly lie against Ford and Winnebago.

■ Even assuming, *arguendo,* that the Hardys could pursue a revocation claim against Ford and Winnebago, we would find that the trial court properly granted the motion for judgment. There was no dispute below that Ford manufactured the motor home's chassis, and that Winnebago manufactured the coach. The written warranties provided by each manufacturer, which were admitted into evidence, expressed as much, and Mr. Hardy explained at trial that the Ford warranty "covers the complete chas[sis] of the [W]innebago" while the Winnebago warranty "applied to the coach or home part."

As § 2–608 makes clear, a buyer may revoke acceptance if, *inter alia,* there is a nonconformity that substantially impairs the value of the goods to him. In *Champion Ford Sales, Inc. v. Levine,* 49 Md.App. 547, 553–54, 433 A.2d 1218 (1981), this Court explained:

> A nonconformity exists when the goods are not in accordance with the obligations under the contract.... The substantiality requirement bars revocation for defects which are trivial or easily corrected ... or for those which merely make the tender somewhat less than perfect.... Whether a nonconformity substantially impairs the product's value to the buyer necessarily involves consideration of subjective factors, i.e., the particular needs and circumstances of the individual buyer, yet proof of substantial impairment requires more than the buyer's subjective assertion that the value of the product to him was impaired; it requires evidence from which the trier of fact, applying objective standards, can infer that the needs of the buyer were not met because of the nonconformity. It is clear that the question of whether there exists a nonconformity which substantially impairs the value to the buyer is one of fact, to be decided by the jury on the facts and circumstances of each individual case.

(Citations omitted.)

As to Ford, the Hardys presented evidence that the drive shaft problem was noisy and inconvenient. They took the

motor home in for repairs three times during their cross-country trip, and left it at Recreation World for several months after their return. The alleged problems with the drive shaft did not prevent the Hardys from making the trip, however, and did not cause them to alter their travel plans significantly. As the trial court explained, two Ford dealers offered to replace the drive shaft during the Hardys' trip but the Hardys chose not to wait for the repairs and decided to proceed with their vacation. The court opined: "[P]robably all would have been well, but all the time he's [Mr. Hardy] going around the country and putting these miles on it and probably making the situation with the drive shaft worse . . . ." Mr. Hardy testified vaguely that when he test drove the motor home in February of 1994 "the drive line still had the noise in it," and Mrs. Hardy asserted, without explanation, that the value of the motor home to her "defi[nately] has gone down." The court pointed out, however, that "[t]here is no evidence from any expert that there is something major wrong with the drive shaft still." Nor was any expert evidence presented as to the value of the vehicle.

As to Winnebago, Mr. Hardy testified that "minor things kept breaking" in the coach during the trip. He specified that a spring popped off the screen door, the clips to the window shades broke, the cover for the sink got wet and swelled, and the water faucets leaked. when the Hardys returned from their trip, Mr. Hardy gave Recreation World a list of 17 problems, 15 of which arguably involved the coach portion of the motor home. With the exception of one item—the cracked windshield—Mr. Hardy did not specify which of the problems were present when the motor home was delivered and which developed during the trip. In any event, Mr. Hardy testified that all but four or five of the items on the list were ultimately repaired and agreed that all of the problems with the coach were "just minor things that a lot [sic] of stuff you would expect from a new vehicle . . . ."

In short, the problems with the drive shaft did not prevent the Hardys from making a trip across the country and back, which put 7,500 miles on the motor home. In Mr. Hardy's

own words, the problems with the coach were "very minor." Thus, the Hardys' own testimony failed to establish that the alleged defects to the motor home substantially impaired its value to them, and the Hardys offered no other testimony in support of that claim. *Compare Champion Ford*, 49 Md.App. at 558, 433 A.2d 1218 (evidence supported jury's conclusion that revocation of acceptance was warranted when car stopped operating after buyer had possessed it for only six days, had put only 109 miles on it, and the remedy of rebuilding engine would have significantly reduced car's value). *See generally* Lee R. Russ, Annotation, *What Constitutes "Substantial Impairment" Entitling Buyer to Revoke His Acceptance of Goods Under UCC § 2-608(1)*, 38 A.L.R. 5th 191, § 2[c] (1996). Viewing the evidence in the light most favorable to the Hardys, as we must, we are satisfied that the trial court properly concluded that the evidence was legally insufficient to establish that the value of the motor home to the Hardys was substantially impaired.

## II

### Implied Warranty of Merchantability

The Hardys next contend that the trial court erred by granting the motions for judgment as to the counts alleging that Ford and Winnebago breached their implied warranties of merchantability. *See* Md. Com. Law Code Ann. § 2-314. The Hardys contend that the evidence showed that "the vehicle failed to survive a single cross country vacation trip." They assert that the evidence further established that the motor home was taken in for repairs four times, but that the defects remained. From this, the Hardys argue that they are entitled to a full refund of the purchase price.

In support of their argument, the Hardys point to the Automotive Warranty Enforcement Act. Md. Com. Law Code Ann. §§ 14-1501—14-1504. Under § 14-1502(c) and (d)(1), a refund may be obtained, under certain circumstances, if the manufacturer or its agents have attempted unsuccessfully to cure a particular defect four or more times. The Hardys

concede that motor homes are not covered by the Automotive Warranty Enforcement Act. They contend that their situation is analogous to that described in § 14–1502(d)(1), however, and suggest that the remedy contemplated by that section therefore be applied.

Even assuming, without deciding, that Ford and Winnebago breached their implied warranties of merchantability, we find the argument to be without merit. The implied warranty of merchantability and the Automotive Warranty Enforcement Act are separate creatures of separate statutes. While the Automotive Warranty Enforcement Act sets forth its own remedies for violations—including a full refund under certain circumstances—the remedy for breach of the implied warranty of merchantability is set forth in § 2–714 of the Commercial Law Article. That section provides, in pertinent part:

. . .

(2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

(3) In a proper case any incidental and consequential damages . . . may also be recovered.

The Hardys presented the trial court with no "special circumstances" suggesting that a full refund was appropriate. As we have explained, despite the alleged defects in the motor home, the Hardys drove the vehicle to California and back. Because they did not want to alter their travel plans, the Hardys declined two offers, along the way, to have the drive shaft replaced. There is no indication that they sought to have any other alleged defects corrected during their trip.

Nor did the Hardys present the court with any evidence from which it could determine the difference between the value of the motor home as accepted and the value it would have had if it had been as warranted. The Hardys tacitly concede this and suggest, in their brief, that "[t]hose amounts

may readily be ascertained in a new trial." The Hardys had their day in court, of course, and are not entitled to a second chance to prove what they failed to prove below.

## III

### Magnuson-Moss Warranty Act

Section 2304 of the Magnuson–Moss Warranty Act, 15 U.S.C.A. §§ 2301–2312, provides, in pertinent part:

(a) In order for a warrantor warranting a consumer product by means of a written warranty to meet the Federal minimum standards for warranty—

(1) such warrantor must as a minimum remedy such consumer product within a reasonable time and without charge, in the case of a defect, malfunction, or failure to conform with such written warranty; [and]

. . .

(4) if the product (or a component thereof) contains a defect or malfunction after a reasonable number of attempts by the warrantor to remedy defects or malfunctions in such product, such warrantor must permit the consumer to elect either a refund for, or replacement without charge of, such product or parts (as the case may be)....

The Hardys point out that both Ford and Winnebago provided written warranties for the motor home. They argue that, under the Magnuson–Moss Warranty Act, the manufacturers were required to either repair the alleged defects within a reasonable time or refund the purchase price. The Hardys contend that the trial court erred by granting judgment in the appellees' favor on the counts based on the Act.

■ There is simply no evidence in the record to support the Hardys' claims that the written warranties were violated. As to Winnebago, Mr. Hardy testified that the problems with the coach were "very minor" and the "stuff you would expect from a new vehicle." He stated that he gave a list containing 17 items to Winnebago and that in February of 1994, just

before he attempted to revoke his acceptance of the motor home, all but "four or five" of the problems had been fixed. Mr. Hardy did not specify which "four or five" problems still existed. Significantly, at least two items on the list—the drive shaft and the right front hub bearing—did not involve the coach. Several more items arguably may not have involved the coach, or may have resulted from the Hardys' misuse and may therefore have been outside the warranty. One item on the list—a request for an extra "set of keys for rear door-locks"—clearly did not involve a breach of warranty.

■ Nor is there sufficient evidence to support the claim that Ford failed to repair the drive shaft. The Hardys offered no expert testimony to explain the problem with the drive shaft, and Mr. Hardy made no attempt to explain the matter himself. He testified only that he heard a loud "metal clinking" sound, that various auto mechanics told him there was some unspecified problem with the drive shaft, and that on one occasion during his cross-country trip he observed that the drive shaft was "glowing red hot." There was no dispute that the latter problem was remedied in Oregon.

Mr. Hardy testified that the service manager of Recreation World informed him in November of 1993 that a Ford dealer had repaired the drive shaft problem. Mr. Hardy testified that he test drove the motor home but "it still had the noise in the drive line." More repairs were made, apparently to the coach portion of the vehicle, and in February of 1994 Mr. Hardy test drove it again. He determined that "the drive line still had noise in it."

While it can be inferred from the mere fact that repairs were made that a problem existed in the drive shaft, no such inference can be drawn as to the state of the drive shaft after November of 1993. Mr. Hardy did not describe the noise he heard in November of 1993 and February of 1994. He did not indicate whether the noise was more or less severe than it had been before the repairs. There was no indication as to whether the noise was unusual or was, in fact, typical in motor homes such as the Hardys'. Indeed, there was no suggestion

that the noise heard after the final repairs to the drive shaft were completed was indicative of a problem. *See generally* 5 Lynn McLain, *Maryland Evidence* § 300.7 (1987) (discussing when expert testimony is necessary). *See Walston v. Dobbins,* 10 Md.App. 490, 494–95, 271 A.2d 367 (1970) (directed verdict as to damages to automobile should have been granted in defendant's favor where plaintiff presented expert witness who testified regarding the value of an average car of like age, make, and model but offered no testimony as to the plaintiff's particular car and the extent of the damage thereto). *Compare East Side Prescription Ctr., Inc. v. E.P. Fournier Co., Inc.,* 585 A.2d 1176, 1179 (R.I.1991) (expert testimony not necessary to establish that vehicle did not conform to what was promised where purchaser testified that he returned vehicle to dealer at least 15 times in 16 months for repairs and ultimately revoked acceptance when car failed to start when picked up at dealership); *Blake v. Federal Way Cycle Center,* 40 Wash.App. 302, 698 P.2d 578, 581 (1985) (expert testimony not necessary to support revocation of acceptance of motorcycle where purchaser testified that motorcycle vibrated and lost speed and that dealer had been unable to correct problem), *cert. denied,* 104 Wash.2d 1005 (1985); *Ventura v. Ford Motor Corp.,* 180 N.J.Super. 45, 433 A.2d 801, 805 (App.Div.1981) (where there was no dispute that car was defective, expert testimony was not necessary, under the circumstances of the particular case, to establish that the manufacturer was responsible for defects).

■ The record does not support the Hardys' contention that the repairs were not made within a reasonable time. It was the Hardys themselves who elected not to have the drive shaft replaced—or any problems with the coach repaired—during their cross-country trip. Mr. Hardy did not testify that, once the motor home was returned to Recreation World for repairs, he requested that the repairs be completed quickly. Mr. Hardy testified that his family had several other vehicles. He did not suggest that the family had any plans to use the motor home that were scuttled due to the lengthy

repairs. Thus, the record would not support a finding that the time taken to complete the repairs was not reasonable.

## IV

### Unfair and Deceptive Trade Practices

■ Finally, the Hardys contend that the trial court erred by granting the appellees' motions for judgment on the unfair and deceptive trade practices count. Unfair or deceptive trade practices are defined in § 13–301 of the Commercial Law Article. The Hardys do not specify precisely which provision or provisions of § 13–301 they contend that the appellees violated. They merely assert that the evidence established that Ford and Winnebago misled them into purchasing the vehicle by providing warranties, and then failed to honor those warranties.

The Hardys' argument rests on the assumption that the defects in the motor home were never cured. As we have explained, however, the Hardys failed to present sufficient evidence to establish that the defects were not timely cured. In any event, even if the Hardys had presented sufficient evidence to establish that the defects were not timely cured, they failed to present any evidence that the conduct of Ford and Winnebago was in any way unfair or deceptive.

This Court has explained that unfair trade practices, under § 13–301 in general, "require proof of '[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that the consumer rely on the same....' " *Klein v. State*, 52 Md.App. 640, 646, 452 A.2d 173 (1982) (quoting § 13–301(9)).[7] The Hardys assert that "Ford and Winnebago lulled

---

7. We are nonplussed by the Hardys' citation to *Gates v. Chrysler Corp.*, 397 So.2d 1187, 1190 (Fla.Dist.Ct.App. 4th Dist.1981). In that case, an intermediate appellate court found that evidence that an automobile manufacturer had published a brochure representing that it would repair defects for one year, coupled with evidence that the manufacturer had been unable to repair certain defects, created a jury question as to whether the manufacturer misled the purchaser. The question

[them] into continuing their use of the vehicle during a cross country trip." They speculate that Winnebago, at least, "wanted the Hardys to exceed the mileage limit" on the motor home's warranty. The Hardys offered no evidence whatsoever in support of these bald allegations, however, and nothing in the record would permit a jury to draw such inferences.

JUDGMENTS AFFIRMED; APPELLANTS TO PAY THE COSTS.

---

involved was not whether the manufacturer had violated Florida's equivalent of Maryland's Unfair and Deceptive Trade Practices statute, *see generally* Fla. Stat. Ann. §§ 501.201—501.213 (1997 Repl.Vol.), but whether the manufacturer had violated another unrelated statute. *See* Fla. Stat. Ann. §§ 320.64, 320.696, and 320.697 (1979).