949 A.2d 26

**Calbert Augustus LAING**

v.

**VOLKSWAGEN OF AMERICA, INC.**

**No. 1040, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

May 29, 2008.

138

Hy David Rubenstein (Kimmel & Silverman, P.C., on the brief), Owings Mills, for appellant.

Ronald G. DeWald (Victor I Weiner, Lipshultz and Hone, Chartered), Silver Spring, for appellee.

Panel: DAVIS, HOLLANDER and CHARLES E. MOYLAN, JR. (retired, specially assigned), JJ.

DAVIS, J.

Shortly after purchasing a 2004 Volkswagen Touareg, appellant, Calbert Augustus Laing, became dissatisfied with the vehicle and, nearly two years later, brought suit against appellee, Volkswagen of America, Inc., the manufacturer. In the complaint filed in February of 2006, appellant alleged three counts of statutory violations for breach of warranties under the Maryland Automotive Warranty Enforcement Act (Maryland Lemon Law)[1] and the Magnuson–Moss Warranty Act, a federal consumer protection oriented statute, for the alleged nonconformities.[2] In the third count, appellant

---

1. The Maryland Automotive Warranty Enforcement Act, also known as the "Lemon Law," is found in Md. Code Ann. (1984, 2001 Repl. Vol.), Com. Law §§ 14–1501 through 14–1504.

2. Unless otherwise provided herein, we shall refer to 15 U.S.C.A. §§ 2301–2312 (1982; 1997 Supp.) as "the Magnuson–Moss Warranty Act."

claimed a violation of the Maryland Consumer Protection Act, which proscribes unfair and deceptive trade practices.[3]

Appellant filed suit regarding three specific defects of the vehicle, in which he claimed that appellee's failure to remedy those conditions constituted the three mentioned statutory violations. On September 26, 2006, appellee moved for summary judgment. The circuit court denied the motion.

On June 6, 2007, the day trial was to have commenced, appellee renewed the motion for summary judgment at the conclusion of all the evidence. With a jury already empaneled, the circuit court found that the undisputed material facts as established by the submissions pursuant to Maryland Rule 2–501(a) were insufficient to generate an issue of fact for the jury to decide. Without expert testimony establishing a defect, the circuit court determined that appellant failed to establish a warranty claim as a matter of law; summary judgment was therefore entered.

Appellant subsequently filed this appeal, raising the following issue, which we have rephrased and consolidated as follows:

Whether the circuit court erred in granting a motion for summary judgment upon finding that appellant failed to establish legally sufficient evidence to pursue his claims under the Magnuson–Moss Warranty Act, the Maryland Automotive Warranty Enforcement Act[4] and the Maryland Consumer Protection Act.

For the following reasons, we affirm the circuit court's deci-

---

3. Unless otherwise provided herein, we shall refer to Md. Code Ann. (1975, 2006 Repl. Vol.), Com. Law § 13–301(14)(xi), titled "Proscribed practices," as "the Maryland Consumer Protection Act."

4. The Maryland Automotive Warranty Enforcement Act, otherwise known as the "Lemon Law," is a statute, enacted in most states, designed to protect a consumer who buys a substandard automobile usually by requiring a manufacturer or dealer, either to replace the vehicle or to refund the full purchase price. *Black's Law Dictionary,* Seventh Edition, 1999.

sion that each cause of action[5] required appellant to prove a defective condition through expert testimony to generate a triable issue for the jury to decide.

## FACTUAL BACKGROUND

In October of 2004, appellant purchased a demonstrator[6] 2004 Volkswagen Touareg from Darcars College Park Volkswagen (Darcars), operating as College Park Motor Cars, Inc., an authorized dealership of appellee, for $44,584. The odometer had a reading of 5,289 miles at the time of sale. A "Limited New Vehicle Warranty" accompanied the sale of the vehicle and covered the remaining portion of the original new car warranty for four years or fifty thousand miles, whichever occurred first. The limited warranty provided for the repair or replacement of parts with defects in materials or workmanship, except for wheel alignment, tire balancing and repair or replacement of tires. Any Volkswagen dealership was authorized to perform the warranty services. Appellant also purchased a maintenance package from Darcars for $875, which stated an agreement that appellee would provide oil changes, tire balancing and rotation and seasonal inspections and appellant was obliged to avail himself of same as required. Appellant received a pamphlet, titled "Owner Information about Consumer Protection Laws," with information regarding his

---

5. *See, e.g.,* Md. Code Ann., Com. Law § 14–1502(c)(1) (Under Maryland Lemon Law, the manufacturer must replace or return the purchase price of the vehicle if the manufacturer is "unable to repair or correct any defect or condition that substantially impairs the use and market value of the motor vehicle to the consumer after a reasonable number of attempts. . . ."); 15 U.S.C.A. § 2304(a)(4) (Under the Magnuson–Moss Warranty Act, the manufacturer must replace or return the purchase price of the vehicle "if the product (or a component part thereof) contains a defect or malfunction after a reasonable number of attempts by the warrantor to remedy defects or malfunctions in such product."); Md. Code Ann., Com. Law § 13–301(14)(xi) (Maryland's Consumer Protection Act proscribes violations of the Maryland Lemon Law.)

6. A demonstrator vehicle is one that has been used for customer road testing or by the employees of the dealership, manufacturer or distributor.

right to enforce warranties upon notifying appellee, in writing, of any nonconformity.

## A. Service History

Over the course of two years, appellant took the vehicle to the dealership "something like [twenty-four] times" for repairs. Repair orders from the dealership document the complaints lodged by appellant on each of those occasions and detail the extent of the services performed. The complaints ranged from pieces of trim on the interior of the vehicle coming loose to more serious issues. The odometer registered approximately 23,000 miles during those two years when many of the "minor" problems were repaired, including the replacement of two broken pieces of trim, application of paint sealant and repair of a loose rail, air bag light, trim on the grill and the horn. According to appellant, there were three other "significant problems," none of which has been resolved: the windshield wiper fluid emitted an odor that made appellant feel nauseous; the tires made "unusual" sounds; and the vehicle hesitated then surged after being stopped.

Virtually each time that the vehicle was taken to the dealer for servicing, the dealer rotated the tires at appellant's request. Nearly every 3,000 miles, appellant scheduled oil changes and had general maintenance services performed as recommended by the manufacturer.

## i. Window Washer Fluid

On January 20, 2005, three months after appellant purchased the vehicle, appellant complained to the dealership of odors from the window washer fluid and exhaust fumes. The dealer inspected the vehicle, but found no leaks. Appellant feared that, because window washer fluids contain poisonous substances, "constant inhaling of the substance can be a very serious health hazard." Two months later, appellant returned to the dealership to complain again of the odor. This time, the dealership suggested that appellant utilize the recirculation setting on his heating and cooling system to prevent exterior odors from penetrating the interior of the vehicle. As part of

the services performed on that day, the dealer rotated the tires.

### ii. Tires

On June 8, 2005, the dealer once again rotated the tires. Days later, appellant returned, this time complaining that the tires were making an "unusual sound." Appellant claimed that, at first, the dealer did not "take the problem very serious[ly]." When appellant returned on June 22, 2005, one of the dealer's technicians road tested the vehicle and concluded that the noise was caused by "cupping" or, in other words, the uneven wearing of the tread. The dealer informed appellant that cupping could not be corrected, but that it could be avoided by rotating the tires every 4,000 miles. Per appellant's request, the tires were rotated and balanced.

On August 24, 2005, rather than going directly to the dealer, appellant contacted "the people at Volkswagen" and persuaded them to pay to replace the tires. At that time, the odometer registered 14,714 miles. Appellee informed appellant that the tires were not covered under warranty, but agreed to replace two of the tires as a matter of goodwill as long as appellant paid for their installation.

The replacement of the two tires "temporarily" corrected the problem. Nearly 6,000 miles later, the cupping problem recurred. In early September of 2005, appellant contacted the manufacturer of the tires and persuaded it to replace the other two tires. The manufacturer sent appellant to Merchant's Tire & Auto Centers, one of their suppliers, to perform the installation.

### iii. Hesitation

Appellant's most significant complaint was that, whenever he attempted to accelerate "the car would sit" and "then after a brief period of about ten seconds or so, it would jump off." The hesitation problem was brought to the dealer's attention on three different occasions. The first time was on or about August 22, 2005. Appellant informed the dealer that he typically noticed hesitation in the mornings when it was cold

outside. The dealer attempted to duplicate the hesitation by keeping the vehicle overnight and test driving it in the morning; however, the dealer's test concluded that the vehicle was performing according to specifications. The second time that appellant complained about the hesitation problem was in mid-September of 2005. In addition to hesitation, appellant reported that there was a "slight shimmy on the steering." [7] To correct the shimmy, the dealer balanced the tires. Despite these efforts, appellant claims that the shimmy persisted. On that visit, the dealer also diagnosed the hesitation as a computer problem and, therefore, installed new computer parts. Shortly after the repairs, the hesitation problem recurred and appellant returned the vehicle for servicing. This time, the dealer diagnosed the hesitation problem as an electrical malfunction in the fuel pump and then replaced the fuel pump. In mid-October of 2005, when appellant lodged his third complaint, the dealership informed appellant that they would need to schedule a test drive with a district representative from their regional office to try to ascertain the problem. Appellant was never contacted to schedule the test drive.[8] On that same visit, appellant notified the dealer about the window washer fluid odor and the vibration of the tires. Once again, the dealer rotated the tires.

Appellant also experienced other problems with the Touareg. In December of 2005, the dealer repaired the parking brake by replacing a cable. In January of 2006, appellant took the vehicle to the dealership, complaining that the locking system failed and that a piece of trim had fallen off the mechanism that operates the seat belt. The dealer replaced the trim, but determined that the locking system was performing to specifications. In March of 2006, the dealer repaired the brake lights and, three months later, it repaired squeaky

---

7. "Shimmy" means an abnormal vibration in the front wheels of a motor vehicle. Webster's New World Dictionary (2nd ed. 1982).

8. Appellee explains that a potential reason why appellant was not contacted is because he retained legal representation around that time.

door hinges. In September of 2006, the dealer repaired the light inside the trunk that was falling off.

## B. The Complaint

The genesis of this appeal is the lawsuit to redress the unrepaired conditions. On February 22, 2006, appellant filed a complaint in the circuit court, alleging the three statutory violations, seeking damages in the amount of the purchase price of the vehicle, consequential damages, attorneys' fees and court costs. In the first count, appellant alleged that, despite appellee's attempts to have the conditions repaired, the conditions substantially impaired the vehicle's use and diminished its market value, thereby constituting a breach of warranties in violation of the Maryland Automotive Warranty Enforcement Act. Under the Maryland Lemon Law, he averred, there is a presumption that a reasonable number of repair attempts have been made when the vehicle is subject to repair four times or when the vehicle has been out of service for a total of thirty calendar days due to the nonconformities. *See generally* Md. Code Ann., Com. Law § 14–1502(c)(1) and § 14–1502(d)(1), (2).

In the second count, appellant alleged violations of the Magnuson–Moss Warranty Act as a result of appellee's failure to conform the vehicle to the warranties. As the foundation for the Magnuson–Moss Warranty Act claim, appellant alleged breach of express warranty,[9] implied warranty of merchantability,[10] implied warranty of fitness for a particular purpose [11] and breach of contract and unfair trade practices.

---

**9.** Express warranties by the seller are created by "[a]ny affirmation of fact or promise . . . which relates to the goods," "[a]ny description of the goods" and "[a]ny sample or model." Md. Code Ann. (1975, 2007 Repl. Vol.), Com. Law § 2–313.

**10.** An implied warranty of merchantability is "implied in a contract . . . if the seller is a merchant with respect to goods of that kind." Md. Code Ann. (1975, 2007 Repl. Vol.), Com. Law § 2–314(1). To be merchantable, goods must at least "[p]ass without objection in the trade under the contract description; . . . [i]n the case of fungible goods, are of fair average quality within the description; . . . [a]re fit for the

In the third count of his complaint, appellant alleged unfair and deceptive trade practices under Maryland's Consumer Protection Act, found in Title 13 of the Commercial Law Article,[12] derived from the alleged violation of the Maryland Automotive Warranty Enforcement Act, *supra.* A violation of the Maryland Automotive Warranty Enforcement Act constitutes an "an unfair or deceptive trade practice" under the Consumer Protection Act. *See* Md. Code Ann., Com. Law § 14–1504(a) and § 13–301(14)(xi).

In May of 2006, appellant designated James E. Lewis of Valley Automotive Consulting as an expert witness. Lewis neither inspected nor road tested the vehicle, but was expected to testify as to the repair history and diminution in value. In a report submitted to the court, Lewis described as "significant facts" the three complaints related to the engine management system, the two complaints involving the electrical system and the two complaints involving the braking system."[13]

### C. Motion For Summary Judgment

On September 27, 2006, appellee moved for summary judgment. Appellee argued that the Maryland Automotive Warranty Enforcement Act is inapplicable to the claim as it only applies to "new vehicles."[14] Alternatively, even if it were

---

ordinary purposes for which such goods are used; ... [r]un, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; ... [a]re adequately contained, packaged, and labeled as the agreement may require" and "[c]onform to the promises or affirmations of fact made on the container or label if any." Md. Code Ann., Com. Law § 2–314(2).

11. An implied warranty of fitness for particular use arises "[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods...." Md.Code Ann. (1975, 2007 Repl. Vol.), Com. Law § 2–315(1).

12. Md.Code Ann., Com. Law § 13–301(14)(xi).

13. Lewis did not testify at the hearing.

14. "If a *new motor vehicle* does not conform to all applicable warranties during the warranty period, the consumer shall, during such period,

applicable, appellee argued that appellant may not pursue remedies under the Lemon Law because he failed to notify the manufacturer of the defects.[15] *See* Md. Code Ann., Com. Law § 14–1502(b)(1). Appellee also argued that Lewis's opinion should be excluded because he had not used any diagnostic test nor road-tested the vehicle and he had formulated an opinion based solely on the repair orders. Appellant had not disclosed any plans to produce any other expert witness to testify as to any defect in materials or workmanship. Thus, appellee averred that appellant's claim solely consisted of his complaints to the dealership, which, in appellee's view, constituted descriptions of symptoms, not allegations of defects in materials or workmanship.

With respect to the count for federal law violations, appellee challenged the implied warranty of fitness for a particular purpose claim on grounds that there was a lack of evidence indicating a particular purpose. Regarding breach of express warranty and implied warranty of merchantability, appellee contended that appellant failed to produce evidence sufficient to establish a defect. Concerning the breach of contract and unfair trade practices, appellee maintained that the Magnuson–Moss Warranty Act simply did not provide any remedy for those alleged violations. For the aforementioned reasons, appellee asserted that it was entitled to judgment as a matter of law on the undisputed facts to support a claim under the Maryland Consumer Protection Act.

On February 28, 2007, the court denied appellee's Motion for Summary Judgment.

---

report the nonconformity, defect, or condition by giving written notice to the manufacturer or factory branch by certified mail, return receipt requested. Notice of this procedure shall be conspicuously disclosed to the consumer in writing at the time of sale or delivery of the motor vehicle." Md.Code Ann., Com. Law § 14–1502(b)(1) (emphasis added).

15. The notification dispute was resolved prior to trial with the parties stipulating that a letter was sent by appellant's counsel to appellee, dated October 24, 2005, notifying Volkswagen of the potential claims.

### D. The Hearing

A hearing was held on June 6, 2007. Prior to the commencement of the hearing, appellee renewed its motion for summary judgment, which was denied. Exhibits were then entered into evidence, including the sales contract, Perfect Delivery Inspection document, Disclosure of Prior Vehicle Use for Dealership or Commercial Purposes document, Maryland Certificate of Title, the warranty, twenty repair orders, the buyer's guide and photographs of the vehicle.

Appellant testified regarding his various complaints and he explained how these conditions have impaired his use of the vehicle. He stated that he purchased a luxury vehicle, believing that it would give him "a nice, smooth ride," but did not believe that he received the benefit of that bargain. "A set of tires," he said, do not last "more than 6,000 miles without the noise." He asserted, therefore, that there was some defective component that was causing the tires to wear unevenly. He also testified that nothing had been done to alleviate the problem with the odor from the window washer fluid, which limited his use of the windshield wipers during rain or snow. Likewise, nothing—other than replacing the fuel pump—had been done to alleviate the hesitation problem, which he claimed "[was] a very serious problem" that could lead to a "serious accident" if he did not pay "special attention."

The defense called Lawrence West, a product liaison engineer for Volkswagen of America, to testify. West inspected and test drove the vehicle in August of 2006. He did not hear any noise coming from the tires, nor did he experience the hesitation, nor did he detect the washer fluid odor. West testified that there were several possible causes of the cupping, including air pressurization and wheel alignment. Large vehicles, such as the Touareg, are "off road style vehicle[s] so the tire blocks tend to be quite large." He explained that, "[w]hen you have a tire that large in circumference, the steel belts that criss-cross and zigzag across the whole tire, they tend to flex and move with time and wear." When air pressure is low, he said, "the tire can run much hotter than it

was normally designed to, which could also cause the belts to shift and the tires could wear funny, the rubber gets much softer, so it starts wearing." He added that failure to monitor the air pressure can cause premature wear.

West testified that he examined the vehicle and its suspension components and "found no play in any of the ball joints or the tie-rod ends," "[t]he steering rack was dry and clean" and there were no leaks. He "looked at the control arms, which are the arms that go from the center of the car and actually go out to the wheels and hold everything in place" and "[t]hey were all in good shape."

West suggested several possible causes of the vehicle's hesitation, including problems with "electrical controls, any of the sensors, or additionally things like the oxygen sensor, the mass air flow sensor, and position sensors [and] the crank shaft position sensors." He explained that it may also have been due to "actual mechanical problems" where something shifts inside the engine, dragging brakes or a transmission that does not shift properly. On the other hand, it may have been the result of some external cause, such as the type of gasoline put in the automobile. Another cause may have been that the vehicle has adapted to appellant's driving style. He explained that "[m]ost cars [nowadays] have computers that are actually a little smarter than us sometimes, and they actually adapt to the way you drive." The Touareg's transmission has a system that "mimics" different driving styles. For example, when appellant operates the vehicle after another driver has driven, it will take some time before the transmission readjusts to his driving style.

The odor, he explained, could only penetrate the interior through the ventilation for the heating and air conditioning. But, he did not smell any odor when he test drove the car.

### E. The Court's Ruling

At the close of the evidence, appellee renewed its motion for summary judgment. The court granted the motion and entered judgment in favor of appellee, reasoning that

[appellant] has produced no expert evidence of an actual defect, condition, malfunction, or nonconformity in the vehicle that he purchased sufficient in the Court's view to sustain a breach of Expressed Warranty or Implied Warranty of fitness for a particular purpose or an Implied Warranty of merchantability. And I say that because there's simply no evidence of the cause of these symptoms in the complaints registered by [appellant].

There's no evidence of the specific defect or defects or conditions existing in the vehicle. Without such proof, submission of this case to a jury would require the jury to speculate as to the existence of the underlying defect or conditions. The Court believes that [appellant] is required to show more than his complaints and symptoms. He's got to show the cause of those to get to the jury.

The defects that he complains about, hesitation, tire cupping, windshield wiper smell, are matters in the Court's view that lie beyond the knowledge of an average person, and expert testimony is required to establish the existence of these kinds of defects. When a vehicle has these kinds of defects, it could be due to any number of reasons. It's [appellant's] burden to negate other reasons if he has any chance of prevailing in his claim using only circumstantial evidence to prove a defect. And in cases like this, expert testimony is required.

\* \* \*

With regard to the state law claim of breach of warranty, whether it's expressed or implied, proof of defect is required to prevail on such cause of action in Maryland. Similarly in a case of a breach of Implied Warranty of merchantability, [appellant] has the burden of proving the defect.

\* \* \*

[Appellant] describes the symptoms, and he's able to describe what does and doesn't work; however, he's simply unable in this case to prove the specific actual defect in the subject vehicle.

In addition, we have in this case testimony from an expert. [Appellee] produced an expert, Lawrence West, who inspected the car, drove it, and monitored it with an on board system's diagnostic computer. He concluded that he reviewed all of the vehicle's systems, found them to be in proper working order, and it was his expert opinion that to a reasonable degree of mechanical certainty, there are no existing defects in material or workmanship of the vehicle.

So in sum, because [appellant] has failed to forecast sufficient evidence with respect to the existence of these alleged defects or conditions, [appellant's] cause of action under all three counts fail, and the Court will not submit this case to the jury.

Additional facts will be provided as necessary.

## LEGAL ANALYSIS

Initially, appellant contends that, in enacting the current Lemon Law, the Maryland General Assembly intended to distinguish breach of warranty claims brought under the Maryland Automotive Warranty Enforcement Act from product liability claims. He posits that Congress had the same intention when enacting the Magnuson–Moss Warranty Act. According to appellant, the relevant distinguishing factor of breach of warranty claims is that the plaintiff is required only to prove that the warrantor failed to remedy a defective condition. The unsuccessful attempts to repair his vehicle were evidence of defect, malfunction and nonconformity; thus, there was no need for expert testimony.

In distinguishing breach of warranty from product liability claims, appellant maintains that, "even for the higher standards of in [sic] products liability cases expert testimony is recognized as important, but not critical." He insists that a defective condition may be inferred from circumstantial evidence that establishes that the vehicle was not functioning properly. In appellant's view, the repair orders presented circumstantial evidence from which the jury could infer defects and that such evidence was sufficient to raise a triable

issue under the Maryland Lemon Law and the Magnuson–Moss Warranty Act. Consequently, the court's grant of summary judgment was erroneous.

Appellant contends that the same principles apply to claims brought under the Magnuson–Moss Warranty Act because it simply applies substantive state law. The federal Act merely allows consumers to pursue their breach of warranty claims in both federal and state courts.[16] Appellant postulates that Congress and the Maryland General Assembly, by enacting these statutes, intended to provide consumers with a remedy against automobile manufacturers without requiring the consumer to prove a specific defect or to show causation. Rather, both legislative bodies intended to provide consumers with a mechanism for pursuing claims by demonstrating that a defective condition could not be remedied. Appellant maintains that requiring him to prove the existence of a specific defect thwarts this intent and overburdens plaintiffs because manufacturers are better situated to diagnose defective conditions.

## I

## STANDARD OF REVIEW

In granting appellee's motion for summary judgment, the circuit court determined that the evidence was insufficient to generate an issue of material fact for the jury to decide. Summary judgment is proper where the trial court determines that there are no genuine disputes as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* Md. Rule 2–501. The trial court should not resolve any issue regarding the credibility of witnesses as those matters are left to the trier of fact. *Syme v. Marks Rentals, Inc.*, 70 Md.App. 235, 238, 520 A.2d 1110 (1987).

In reviewing the grant of a motion for summary judgment, appellate courts focus on whether the trial court's

---

**16.** Appellee concedes that the Magnuson–Moss Warranty Act does not create a new cause of action and that it merely incorporates substantive state law.

grant of the motion was legally correct. *Wood v. Toyota Motor Corp.*, 134 Md.App. 512, 516, 760 A.2d 315 (2000) (citing *Beatty v. Trailmaster Products, Inc.*, 330 Md. 726, 737, 625 A.2d 1005 (1993)). The parameter for appellate review is determining "whether a fair minded jury could find for the plaintiff in light of the pleadings and the evidence presented, and there must be more than a scintilla of evidence in order to proceed to trial. . . ." *Id.* Additionally, if the facts are susceptible to more than one inference, the court must view the inferences in the light most favorable to the non-moving party. *Id.; see Delia v. Berkey*, 41 Md.App. 47, 395 A.2d 1189 (1978), *aff'd*, 287 Md. 302, 413 A.2d 170 (1980).

In granting appellee' motion for summary judgment, the circuit court determined that the evidence supplied was insufficient to make a *prima facie* case. Appellant challenges that ruling by disputing the circuit court's understanding of the elements necessary to make a breach of warranty claim under the state and federal automotive warranty enforcement laws. We initially consider appellant's arguments based on federal law.

## II

### MAGNUSON–MOSS WARRANTY ACT

Appellant claims that the recurrence of the language, "defect, malfunction, or failure to conform," in the Magnuson–Moss Warranty Act indicates Congress' intent to "widen the definition of a covered condition from a defect to a defect, or a malfunction, or a failure to conform." Thus, appellant argues that his testimony in conjunction with the repair orders supplied sufficient evidence of a malfunction to prevail under the federal Act.

The Magnuson–Moss Warranty Act was enacted in 1975 "to improve the adequacy of information available to consumers, prevent deception, and improve competition in the marketing of consumer products." 15 U.S.C.A. § 2302(a) (1975). The legislation was enacted in response to consumer complaints regarding express warranties and disclaimers. Thus, the

**154**

purpose of this legislation is "(1) to make warranties on consumer products more readily understood and enforceable, (2) to provide the Federal Trade Commission (FTC) with means of better protecting consumers and (3) to authorize appropriations for the operations of FTC...." H.R.Rep. No. 93–1107 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7702, 7702 (1974). The Act empowers the Federal Trade Commission to prescribe the rules necessary to achieve these objectives. 15 U.S.C.A. § 2302(b). It allows a consumer "who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter, or under a written warranty, implied warranty, or service contract" to "bring suit for damages and other legal and equitable relief ... in any court of competent jurisdiction in any State or the District of Columbia." 15 U.S.C.A. § 2310(d)(1) (1975).

Warranties fall within one of two categories under the Act. An "implied warranty" means "an implied warranty arising under State law." 15 U.S.C.A. § 2301(7) (1975). "Written warranty" means

(A) any written affirmation of fact or written promise made in connection with the sale of a consumer product by a supplier to a buyer which relates to the nature of the material or workmanship and affirms or promises that such material or workmanship is defect free or will meet a specified level of performance over a specified period of time, or

(B) any undertaking in writing in connection with the sale by a supplier of a consumer product to refund, repair, replace, or take other remedial action with respect to such product in the event that such product fails to meet the specifications set forth in the undertaking which written affirmation, promise, or undertaking becomes part of the basis of the bargain between a supplier and a buyer for purposes other than resale of such product.

15 U.S.C.A. § 2301(6).

The Magnuson–Moss Warranty Act further delineates two types of written warranties. Any warrantor who issues a

written warranty shall "clearly and conspicuously" designate the warranty as "full" or "limited." 15 U.S.C.A. § 2303 (1975). By designating the warranty as "full," the warrantor incorporates the established federal minimum standards. 15 U.S.C.A. § 2304(e) (1975). Section 2304 imposes federal minimum standards for "full warranties" and sets out the minimum remedies for breach. Those federal minimum standards are as follows:

(1) such warrantor must as a minimum remedy such consumer product within a reasonable time and without charge, in the case of a defect, malfunction, or failure to conform with such written warranty;

(2) notwithstanding section 2308(b) of this title, such warrantor may not impose any limitation on the duration of any implied warranty on the product;

(3) such warrantor may not exclude or limit consequential damages for breach of any written or implied warranty on such product, unless such exclusion or limitation conspicuously appears on the face of the warranty; and

(4) if the product (or a component part thereof) contains a defect or malfunction after a reasonable number of attempts by the warrantor to remedy defects or malfunctions in such product, such warrantor must permit the consumer to elect either a refund for, or replacement without charge of, such product or part (as the case may be). . . .

15 U.S.C.A. § 2304(a). Conversely, if a written warranty fails to meet the federal minimum standards, then the warrantor must conspicuously designate the warranty as "limited." 15 U.S.C.A. § 2303(a)(2).

Consumers with full warranties are entitled to special remedies for violations of the Act. Only in the case of a "full warranty," when the consumer product is defective, malfunctions or fails to conform with the written warranty, the warrantor is required to provide a full refund of the purchase price or the replacement of the product if the defect cannot be remedied after a reasonable number of attempts. 15 U.S.C.A. § 2304(a)(1), (4); *see also* 15 U.S.C.A. § 2303; *see generally MacKenzie v. Chrysler Corp.*, 607 F.2d 1162, 1167 (5th Cir.

1979) ("The remedies set forth in [15 U.S.C.A. § 2304] are applicable only to 'full' warranties.").

By definition, no federal minimum standards apply to a limited warranty; thus, limited warrantors are not obligated to provide consumers with the minimum remedies found in § 2304. *See generally* 15 U.S.C.A. §§ 2303–2304. Instead, actions for breach of limited or implied warranties are governed by state laws. *See id.; MacKenzie,* 607 F.2d at 1167; *Schimmer v. Jaguar Cars, Inc.,* 384 F.3d 402, 405 (7th Cir. 2004) (Consumers may enforce written and implied warranties under the Act in federal court, "borrowing state law causes of action."); *Gardynski–Leschuck v. Ford Motor Co.,* 142 F.3d 955, 956 (7th Cir.1998). Therefore, from the consumer's perspective, "The chief advantage of proceeding under the Magnuson–Moss Act for breach of limited warranty or breach of implied warranty is the availability of attorney fees to a prevailing consumer under 15 U.S.C. § 2310(d)(2)." *Mayberry v. Volkswagen of Am., Inc.,* 278 Wis.2d 39, 692 N.W.2d 226, 232 (2005).

The case *sub judice* involves implied warranties and a written warranty labeled "limited." These warranties are not subject to the minimum requirements of § 2304, *supra,* and, accordingly, appellant is not entitled to those substantive remedies under the federal Act. To prevail on a state claim under the Magnuson–Moss Warranty Act, appellant contends that a plaintiff does not need to prove a specific defect, but only that the vehicle has malfunctioned and that appellee was unable to remedy the condition within a reasonable number of attempts. Appellant argues that courts must distinguish between product liability claims, which require proof of a specific defect, from breach of warranty actions. Moreover, appellant claims "[t]here is nothing in the text of either the Maryland Lemon Law or the Magnuson–Moss Warranty Act that requires the purchaser of the automobile to present expert testimony as to the failure of the automobile to perform properly."

■ There are relatively few reported cases in Maryland that discuss the application of substantive state law under the Magnuson–Moss Warranty Act, although it is well established that the Magnuson–Moss Warranty Act "supplements State law with regard to its limited and implied warranty provisions." *Crickenberger v. Hyundai Motor Am.*, 404 Md. 37, 944 A.2d 1136 (2008); *accord Champion Ford Sales, Inc. v. Levine*, 49 Md.App. 547, 433 A.2d 1218 (1981) ("The Act thus permits recovery of attorneys' fees by a consumer who prevails in an action against the seller for breach of an implied warranty under state law provided the seller is afforded an opportunity to cure."); *Hardy v. Winnebago Indus., Inc.*, 120 Md.App. 261, 706 A.2d 1086 (1998).

In *Crickenberger, supra,* a recent decision of the Court of Appeals,[17] the claims pursued in that lawsuit and the contentions raised therein are remarkably analogous to those claimed in the case *sub judice.* The Court in that case held that "[t]he Magnuson–Moss Act requires no less than Maryland Law in order to establish a breach of a limited or implied warranty as to a consumer product." [18] *Id.* Thus, the Court concluded that a state law claim under the Magnuson–Moss Act requires that the plaintiff prove that a specific defect existed at the time of sale. *Id.*

In that case, Mary Susan Crickenberger purchased a Hyundai with an odometer reading over 8,000 miles. The Hyundai came with a limited warranty that covered the repair or replacement of any defect in materials or workmanship. The vehicle had previously been used by the Hertz Corporation as part of its rental fleet. During her ownership, Crickenberger had various components of the vehicle repaired and replaced,

---

**17.** The Court of Appeals granted *writ of certiorari, sua sponte,* while the appeal was still pending in this Court. *Crickenberger v. Hyundai,* 402 Md. 36, 935 A.2d 406 (2007).

**18.** Because the parties filed their briefs before the Court of Appeals issued its ruling in *Crickenberger v. Hyundai Motor Am.,* 404 Md. 37, 944 A.2d 1136 (2008), neither party has cited to the decision in their respective briefs.

including, *inter alia,* a fuel pump, battery, canister close valve, the alternator and generator. She also experienced "ongoing operating problems." Two years after the purchase of the vehicle, the dealer repaired the front fender and a headlamp that were damaged as a result of an accident. When the odometer registered 63,700 miles, the vehicle ceased working altogether. Crickenberger filed a lawsuit against Hyundai Motor America (HMA) after its authorized dealer refused to replace the engine under the limited warranty. Her complaint alleged violations of the Maryland Consumer Protection Act, Magnuson–Moss Warranty Act and the Maryland Automotive Warranty Enforcement Act. HMA moved for summary judgment, which was granted.

Although Crickenberger had a limited warranty, she relied on the minimum remedies provided for full warranties under § 2304, *supra,* of the Magnuson–Moss Warranty Act. Crickenberger argued that, even though state law requires a plaintiff to demonstrate a specific defect, the federal statute does not. In making this argument, Crickenberger relied on out-of-state cases, all of which were distinguished.[19] The Court of Appeals held that "[i]nasmuch as these cases apply full warranty requirements to limited warranties, in dissonance with state law, we decline to follow them." *Crickenberger, supra,* at 48, 944 A.2d 1136.

### A. Burden of Production

Crickenberger next relied on *Osburn v. Bendix Home Sys., Inc.,* 613 P.2d 445 (Okla.1980), *Genetti v. Caterpillar, Inc.,* 261 Neb. 98, 621 N.W.2d 529 (2001), and *Vernon v. Lake Motors,* 26 Utah 2d 269, 488 P.2d 302 (1971), for the proposition that circumstantial evidence may be used to support an inference that the vehicle was defective. The Court rejected Cricken-

---

**19.** *Mason v. Porsche Cars of North Am., Inc.,* 688 So.2d 361 (Fla.Dist.Ct. App.1997), *Universal Motors, Inc. v. Waldock,* 719 P.2d 254 (Alaska 1986) and *Cline v. DaimlerChrysler Co.,* 114 P.3d 468 (Okla.Civ.App. 2005) were all cases involving full warranties and, accordingly, all relied on the application of the minimum substantive remedies under § 2304, *supra.*

berger's theory that the federal Act lowers a plaintiff's burden to establish a *prima facie* breach of implied or limited warranty case. *Crickenberger*, at 48–49, 944 A.2d 1136.

In reaching that decision, the Court turned to Maryland case law for support. In *Hacker v. Shofer*, 251 Md. 672, 676–77, 248 A.2d 351 (1968), a case involving a claim for breach of implied warranty based on a defective bicycle that led to an accident, the Court held that, in order to prevail on a theory of breach of express or implied warranty, the plaintiff must prove that the product did not conform to the representations of the warranty at the time it left the seller's control.[20] "[T]o allow the jury to decide whether there was a breach of warranty, there must be some evidence beyond mere speculation which would enable the jury to rationally decide it is more probable than not that the defect existed at the time of sale...." *Giant Food, Inc. v. Wash. Coca–Cola Bottling Co., Inc.*, 273 Md. 592, 609, 332 A.2d 1 (1975). Irrespective of whether the theory of recovery is breach of warranty, negligence or strict liability, a plaintiff must show "three 'product litigation basics'—defect, attribution of defect to seller, and a causal relationship between the defect and the injury." *Ford Motor Co. v. Gen. Accident Ins. Co.*, 365 Md. 321, 335, 779 A.2d 362 (2001) (citing *Harrison v. Bill Cairns Pontiac of Marlow Heights, Inc.*, 77 Md.App. 41, 50, 549 A.2d 385 (1988)). Consequently, a plaintiff must prove that there was a defect and that the defect existed at the time of sale.

In some instances, by virtue of the circumstances themselves, an inference may reasonably be drawn that the product is inherently defective. *Ford Motor Co.*, 365 Md. at 337, 779 A.2d 362 (quoting *Harrison*, 77 Md.App. 41, 549 A.2d 385). A defect attributable to the manufacturer of the product may be inferred "where circumstantial evidence tends to eliminate other causes, such as product misuse or alteration...." *Id.* An example of when such an inference may

---

**20.** The plaintiff, it should be noted, bears the same burden of proof for strict liability and negligence claims. *Ford Motor Co.*, 365 Md. at 334, 779 A.2d 362.

reasonably be drawn is when a new vehicle malfunctions and results in an accident. *See, e.g., Phipps v. Gen. Motors Corp.,* 278 Md. 337, 345–46, 363 A.2d 955 (1976) ("[T]he steering mechanism of a new automobile should not cause the car to swerve off the road . . .; the drive shaft of a new automobile should not separate from the vehicle when it is driven in a normal manner . . .; the brakes of a new automobile should not suddenly fail . . .; and the accelerator of a new automobile should not stick without warning, causing the vehicle suddenly to accelerate.") (internal citations omitted). In any event, "[o]ne's right to recovery may not rest on any presumption from the happening of an accident" alone; there must always be some proof of defect. *Harrison,* 77 Md.App. at 51, 549 A.2d 385 (quoting *Jensen v. Am. Motors Corp.,* 50 Md.App. 226, 232, 437 A.2d 242 (1981)).

 The point at which circumstantial evidence sustains an inference is when the proof of defect rises above "surmise, conjecture, or speculation." *Harrison,* 77 Md.App. at 51, 549 A.2d 385. The following four factors are considered by courts in determining whether the circumstantial evidence supports an inference of a product defect:

> (1) expert testimony as to possible causes; (2) the occurrence of the accident a short time after the sale; (3) same accidents in similar products; (4) the elimination of other causes of the accident; (5) the type of accident that does not happen without a defect.

*Id.* (quoting *Cornell Drilling Co. v. Ford Motor Co.,* 241 Pa.Super. 129, 359 A.2d 822, 827 (1976), *overruled on other grounds by REM Coal Co. v. Clark Equip. Co.,* 386 Pa.Super. 401, 563 A.2d 128, 134 (1989); Prosser, *Law of Torts,* § 103, at 673–74 (4th ed. 1971)).

The Court concluded that Crickenberger failed to establish that the vehicle was defective at the time it left HMA's control. *Crickenberger, supra,* at 56, 944 A.2d 1136. A trier of fact could not reasonably infer the existence of a defect because Crickenberger had not eliminated other potential causes of the operating problems. *Id.* Crickenberger's vehicle

had many miles of usage prior to her purchase; no evidence was produced as to the state of the vehicle's care while it was owned by the Hertz Corporation; the vehicle had also been involved in an accident while in Crickenberger's possession; and there was nothing to indicate that the operating problems were unrelated to that accident. *Id.* Furthermore, according to the service orders, Crickenberger did not obtain general maintenance services at the intervals recommended by the manufacturer. *Id.* Under these circumstances, expert testimony was necessary to establish a defect linked to the materials or workmanship by a process of elimination of all other possible causes of the vehicle's problems. *Id.* The Court held that, without expert testimony, Crickenberger's testimony as to the existence of a defect was nothing more than mere speculation. *Id.*

### B. The Instant Case

Appellant relies on the same out-of-state cases that were relied on by Crickenberger, including *Mason v. Porsche Cars of North Am., Inc.*, 688 So.2d 361 (Fla.Dist.Ct.App.1997), *Universal Motors, Inc. v. Waldock*, 719 P.2d 254 (Alaska 1986) and *Cline v. DaimlerChrysler Co.*, 114 P.3d 468 (Okla.Civ.App. 2005). These cases are all distinguishable from the circumstances of the case *sub judice* for the same reasons that they were distinguished in *Crickenberger*—the minimum substantive remedies found in § 2304, *supra,* do not apply to limited warranties.

Appellant also relies on *Osburn v. Bendix Home Sys., Inc.*, 613 P.2d 445 (Okla.1980); *Genetti v. Caterpillar, Inc.*, 261 Neb. 98, 621 N.W.2d 529 (2001); and *Vernon v. Lake Motors,* 26 Utah 2d 269, 488 P.2d 302 (1971), and his arguments parallel those made in *Crickenberger, supra.* As the Court held in *Crickenberger,* whether circumstantial evidence, rather than direct proof of an actual defect, is sufficient to make out a *prima facie* breach of warranty claim depends on the nature of the circumstances and the facts of the particular case.

Preliminarily, a relevant factor which weighs in appellant's favor is that appellant, unlike Crickenberger, adhered to the

manufacturer's recommendations and regularly obtained oil changes, had the tires balanced and rotated and had general maintenance services regularly performed. There was nothing in the history of the Touareg's ownership to indicate any misuse or other potential causes of mechanical problems attributed to previous owners.

■ Despite the proper routine repair maintenance of the Touareg, the evidence was insufficient to overcome the burden of production necessary to generate a material issue for the jury. Appellant produced repair orders evidencing that he registered his complaints to the dealership regarding several problems inherent in the vehicle. Many of the defects were repaired; however, the hesitation, the odor from the window washer fluid and the cupping of the tires, according to appellant, continued to be problems. Appellant's testimony and the repair orders are insufficient to establish defect, attribution of defect to the seller and existence of defect at the time of sale. This evidence is insufficient, even when viewed in the light most favorable to appellant, for any reasonable trier of fact to conclude that the vehicle is affected by any defect in materials or workmanship.

Although appellant has repeatedly complained of these conditions, there is no other documentation evidencing the existence of these conditions or to link them to a defect attributable to the manufacturer. West, the expert who testified at the hearing, test drove and inspected the Touareg. He did not hear any noise coming from the tires, experience any hesitation, nor smell any odor emanating from the washer fluid. No one, other than appellant, ever smelled the window washer fluid odor and no one, other than appellant, experienced the hesitation.

Moreover, West testified that the vehicle may be displaying certain symptoms due to reasons other than defective materials or workmanship. With respect to the tires, appellant testified that he *believed* that there was something defective with the vehicle that is causing the tires to wear unevenly. The dealership advised appellant that there was only one

solution to the tire problem. Appellee's representative instructed appellant to have the tires rotated every 4,000 miles; however, appellant testified that he had the tires rotated and balanced each and every time he took the vehicle in for servicing. At the hearing, West identified an alternative explanation for the cupping, i.e., uneven wear of the tires may be caused by air pressurization. He suggested that the cupping may be caused by appellant's failure to regularly monitor the air pressure in the tires.

West indicated that his identification of potential causes of hesitation were too complex for him to discuss them all. Of those that were mentioned, many involved a malfunctioning component while others were unrelated to the materials or workmanship of the vehicle. For instance, because of the technological intricacies of the computerized engine, the vehicle's ability to adjust to the manner in which the operator drove the vehicle may have caused the vehicle hesitation. Another potential cause may be due to the type of gasoline used in the vehicle.

To counter the alternative causes, appellant suggested that, by virtue of replacing the computer parts and the fuel pump in an unsuccessful attempt to repair the hesitation, the dealer conceded that hesitation was caused by some mechanical component malfunctioning. On cross-examination, appellant testified that the serviceman told him that the computer part was being replaced to remedy the hesitation problem; however, that causal link was never documented in any of the repair orders. To generate an issue for the jury, appellant was required, at a minimum, to show that the hesitation problem was related to a specific malfunctioning component. Based on all of the evidence adduced, a jury could not determine that there was a defect and that the defect existed at the time of sale. To do so would require the jury to engage in speculation and conjecture. Thus, favorable expert testimony was necessary to sustain appellant's burden of production. *See generally* 5 Lynn McLain, Maryland Practice: *Maryland Evidence,* State and Federal § 300.7 (1987) ("If the trier of fact could not reasonably infer a fact essential to a party's charge, claim, or

defense without favorable expert testimony, the party will fail to meet its burden of production if it fails to produce adequate expert testimony.") Under the circumstances, a reasonable jury could not return a verdict in favor of appellant on the evidence presented. Summary judgment was appropriate.

## III

## MARYLAND AUTOMOTIVE WARRANTY ENFORCEMENT ACT

Additionally, appellant invokes the remedial provisions of the Maryland Automotive Enforcement Act, seeking to return the vehicle and to obtain a full refund of the purchase price. Appellant suggests that the Maryland General Assembly enacted the Lemon Law because "the then current law was inadequate to protect automobile consumers" and, therefore, the intent of the legislature was to create a new cause of action. The clear intent of the legislature, according to appellant, was "to expand the class of maladies covered by the Lemon Law from just defects to any nonconformity, defect, or condition." Appellant suggests that this language is evidence that the legislature intended to differentiate warranty causes of action from product liability standards.

The Maryland Automotive Warranty Enforcement Act expands the warranty provisions of the Maryland Commercial Law Article, §§ 2–313 through 2–318, only insofar as it provides special remedies for the breach thereof. *Murphy v. 24th St. Cadillac Corp.*, 353 Md. 480, 489, 727 A.2d 915 (1999) (The Court discussed the expansion of the Maryland Lemon Law warranty provisions to apply to automobile leasing arrangements under the Consumer Motor Vehicle Leasing Contracts Act, found in §§ 14–2001 through 14–2010 [21] of the Maryland Commercial Law Article. In that context, the Court interpreted the Maryland Lemon Law to require the plaintiff to prove the existence of a defect.); *Hardy*, 120

---

21. Md. Code Ann. (1987, 2007 Repl. Vol.), Com. Law §§ 14–2001 through 14–2010.

Md.App. 261, 706 A.2d 1086 (holding that an implied warranty of merchantability and the Automotive Warranty Enforcement Act are "separate creatures of separate statutes" with separate remedies for their respective violations). Section § 14–1502(c)(1) of the Maryland Commercial Law Article provides that "[i]f, during the warranty period, the manufacturer or . . . its authorized dealer is unable to repair or correct any defect or condition that substantially impairs the use and market value of the motor vehicle to the consumer after a reasonable number of attempts, the manufacturer . . . shall . . . [r]eplace the motor vehicle" or ". . . refund to the consumer the full purchase price. . . ."

Special remedies under the Maryland Lemon Law are available when the defects cannot be rectified. There is a presumption that reasonable attempts to repair have been undertaken, if "[t]he same nonconformity, defect, or condition has been subject to repair 4 or more times" or "[t]he vehicle is out of service by reason of repair of 1 or more nonconformities, defects, or conditions for a cumulative total of 30 or more days during the warranty period" or "[a] nonconformity, defect, or condition resulting in failure of the braking or steering system has been subject to the same repair at least once within the warranty period . . . and the repair does not bring the vehicle into compliance with the motor vehicle safety inspection laws of the State." Md. Code Ann., Com. Law § 14–1502(d).

When these special remedies are sought, the plaintiff is required to establish "(1) the existence of a defect, (2) the defect must be one that the manufacturer is unable to fix after a reasonable number of attempts, and (3) the defect must be one that substantially interferes with the use and market value of the vehicle." *Evans v. Gen. Motors Corp.*, 459 F.Supp.2d 407, 412 (D.Md.2006) (citing *Murphy v. 24th St. Cadillac Corp.*, 353 Md. 480, 727 A.2d 915 (1999)).

Appellant has failed to do so. As we have discussed, *supra,* the evidence does not sustain an inference of the existence of a specific defect nor establish a causal link between that defect and the diminished value of the vehicle.

## IV

## MARYLAND CONSUMER PROTECTION ACT

Appellant's claim that the failure to cure the defects constituted a breach of the Maryland Consumer Protection Act must also fail. Md. Code Ann., Com. Law § 13–301(14)(xi). A violation of the Automotive Warranty Enforcement Act is an unfair and deceptive trade practice under the Consumer Protection Act. *Evans,* 459 F.Supp.2d at 414. In other words, a claim under the Maryland Consumer Protection Act is a derivative of the Automotive Warranty Enforcement Act and, therefore, a violation of the former is predicated on a claim for the violation of the latter. *Id.* Thus, to prevail on the Maryland Consumer Protection Act claim, appellant was required to prevail on his Lemon Law claim and, having failed to prove a defect under the Maryland Lemon Law, appellant also has failed to prove unfair and deceptive trade practices.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**