958 A.2d 372

**David Aaron ZITTERBART, et al.**

v.

**AMERICAN SUZUKI MOTOR CORPORATION.**

**No. 897, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

Oct. 7, 2008.

496

Ronald L. Rowland (Kimmerl & Silverman, P.C., on brief), Owings Mills, for Appellant.

Michael S. Barranco (Pope & Hughes, P.A., on brief), Towson, for Appellee.

Panel: EYLER, DEBORAH S., ZARNOCH, WRIGHT, JJ.

EYLER, DEBORAH S., J.

In the Circuit Court for Harford County, Michelle M. and David A. Zitterbart, the appellants, sued American Suzuki Motor Corporation ("Suzuki"), the appellee, alleging violations of the Maryland Automotive Warranty Enforcement Act, Md. Code (1975, 2005 Repl.Vol., 2007 Supp.), section 14–1501 *et seq.* of the Commercial Law Article ("CL") ("Lemon Law"); the Magnuson–Moss Warranty—Federal Trade Commission Improvement Act, 15 U.S.C. 2301 *et seq.* ("MMWIA"); and the Maryland Consumer Protection Act ("MCPA"), CL section 13–101 *et seq.*, all arising out of Suzuki's sale and the Zitterbarts' purchase of a Suzuki automobile. The court granted summary judgment in favor of Suzuki on all counts.

On appeal, the Zitterbarts pose four questions,[1] which we have combined and restated:

---

1. The questions as posed by the Zitterbarts are:
 "1. Must Appellants prove the Existence of an Incurable Defect Under the Maryland Automotive Warranty Enforcement Act?
 2. Must Appellants Prove the Existence of an Incurable Defect Under the Magnuson–Moss Warranty Improvement Act?
 3. Was the notice requirement of Section 14–1502(b)(1) a condition precedent to Appellants' filing this lawsuit?

I. Did the circuit court err in granting summary judgment to Suzuki on the Lemon Law claim and, derivatively, the MCPA claim?

II. Did the circuit court err in granting summary judgment to Suzuki on the MMWIA claim?

For the reasons we shall explain, we hold that the circuit court did not err in granting summary judgment in favor of Suzuki on all claims.

## FACTS AND PROCEEDINGS

On July 17, 2004, the Zitterbarts purchased a "demonstrator model" 2004 Suzuki Verona automobile from an authorized Suzuki dealership. The vehicle had 4,849 miles on its odometer. It came with a "New Vehicle Limited Warranty" of 36 months or 36,000 miles, whichever came first, and a "Limited Powertrain Warranty" of 84 months or 100,000 miles, also whichever came first.

Beginning four months later, on November 15, 2004, the Zitterbarts brought the Verona to an authorized Suzuki dealership for the following servicing and/or complaints, and these steps were taken:

- *November 15, 2004 (10,575 miles):* Check engine light came on and the vehicle was "spitting and sputtering." Dealer "cleared adaptives and set VIN" in the computer. Car returned the same day.

- *November 22, 2004 (10,934 miles):* Check engine light came on again but went off. Dealer "found check engine light was not on at time of service." Diagnostic codes checked, but "no problems found at this time." Car returned the same day.

- *January 17, 2005 (13,579 miles):* Car brought in for oil and filter change, lubrication, and tire rotation. Zitterbarts report that the check engine light "comes on and

---

4. Is there sufficient evidence of the existence of a legitimate, genuine issue of material fact to be decided?"

off." Dealer finds "cause: vacuum hose split," and replaces vacuum hose. Car returned the same day.

- *May 5, 2005 (18,393 miles):* Zitterbarts bring car in complaining of "fe[eling] hesitation and loss of power for about mminute [sic] or so on occasion." Dealer finds fuel filter contaminated with dirt. Replaces oil filter and notes on invoice, "CONDITION OF FUEL FILTER INDICATES CUSTOMER MAY DEVELOP SECONDARY FUEL SYSTEM PROBLEMS FOR THE CONTAMINATION SUCH AS FUEL PUMP, FUEL INJECTORS AND FUEL INJECTION SYSTEM ETC. THESE ARE NOT WARRANTY ITEMS IF DETERMINED CAUSED BY DIRT IN THE FUEL SYSTEM AND FILTER." Car returned the same day.

- *July 8, 2005 (21,125 miles):* Zitterbarts bring car in with coupon, requesting oil change. They report that check engine light flashed and RPMs jumped. Dealer flushes the fuel injection system and, in checking codes, finds a misfire condition; replaces spark plug. Dealer test drives vehicle and finds "light back on." Clears codes and test drives a second time. Light did not come back on and code did not reset. Dealer finds "no misfire condition at this time." Car was ready the next day (July 9).

- *July 11, 2005 (21,151 miles):* Zitterbarts return complaining of "check engine light back on" and engine "running rough." Dealer diagnoses "engine misfire" and replaces cylinder head assembly, catalytic converter, and exhaust manifold (all free of charge). Car was ready on July 27.

- *July 29, 2005 (21,214 miles):* Zitterbarts return stating that check engine light is on. Dealer checks and finds "cause: hose off." Replaces fuel injector (free of charge). Car was ready on August 2.

The only evidence of any servicing of the vehicle thereafter was on May 2, 2006 (odometer at 34,754 miles), when the dealer replaced an oxygen sensor.[2]

---

2. The very first visit the Zitterbarts made to a Suzuki dealer after purchase was on November 4, 2004 (10,077 miles). They brought the

■■■■■■■■■■■

On May 23, 2006, the Zitterbarts filed the instant suit. After Suzuki answered, a period of discovery followed, ending on February 2, 2007. On February 16, 2007, Suzuki filed a motion for summary judgment on all counts. By then, Suzuki had identified Ben Perricone, its District Service and Parts Manager, as an expert witness and Mr. Perricone had inspected and test driven the Verona (odometer at 49,991 miles). He also had furnished a report in which he opined that the servicing performed on the car had resolved any "customer concern" and that the car did not have any "uncorrectable defects or non-conforming conditions that substantially impair" its use, safety, or value.

The Zitterbarts had identified Steven Ruch as an expert witness on November 20, 2006. As of the time Suzuki's motion for summary judgment was filed, however, Mr. Ruch had not inspected, test driven, or seen the Verona.

The court scheduled a hearing on the summary judgment motion for March 6, 2007. The day before, the Zitterbarts filed an opposition, supported by an affidavit by Mrs. Zitterbart and a report by Mr. Ruch, which was postdated to March 6. In her affidavit, Mrs. Zitterbart attested that the car was having "hesitation" problems. In his report, Mr. Ruch said he had test driven the car on March 5 (odometer at 51,191 miles) and that its "powertrain system appeared to be operating as designed." Mr. Ruch did not identify any specific defect, condition, or nonconformity of the vehicle. He repeatedly referred to the car's having been serviced for a "defect in the powertrain," without stating the nature of the defect. He opined that the repair history of the Verona made it less valuable than it otherwise would be. (We shall discuss Mr. Ruch's opinions in greater detail below.)

---

car in for an oil and filter change, and reported that there was a nail in the left rear tire. They also reported receiving a recall notice for a part. The dealer removed the nail, patched the tire, and replaced the recalled part. The car was returned that day. The Zitterbarts do not contend that this servicing visit is relevant to their claims in this case.

After the summary judgment hearing went forward as scheduled, the court held the matter *sub curia.* On April 24, 2007, it issued a memorandum opinion and order granting summary judgment to Suzuki on the Lemon Law and MCPA claims but denying summary judgment on the MMWIA claim. With respect to the Lemon Law claim, the court ruled that, although the evidence established that the "dealer serviced the vehicle a number of times, [the Zitterbarts] and their expert cannot point to one specific defect in the vehicle at the present time." The court further ruled that the MCPA claim was wholly derivative of the Lemon Law claim, and therefore could no t stand.

The court ruled that the MMWIA claim required application of Maryland warranty law; that the summary judgment record established "that the express warranty to repair any defects in material or workmanship was ultimately adhered to"; and that there was no evidence of "a particular defect currently affecting the vehicle" to support a breach of implied warranty claim. The court concluded, however, that the Zitterbarts might be entitled to incidental damages under section 2304 of the MMWIA, if a trier-of-fact were to find that the car was not repaired within a reasonable period of time. Suzuki filed a timely motion for reconsideration, arguing that section 2304 did not apply. Before that motion was ruled upon, the Zitterbarts filed a stipulation that they had not incurred any incidental damages in any event. Thereafter, on May 11, 2007, the court issued a revised memorandum opinion and order granting summary judgment on all counts.

After filing a timely but unsuccessful motion for reconsideration, the Zitterbarts noted this appeal. We shall include additional facts as necessary to our discussion of the issues.

## STANDARD OF REVIEW

We review a circuit court's decision to grant summary judgment *de novo.* *Crickenberger v. Hyundai Motor America,* 404 Md. 37, 45, 944 A.2d 1136 (2008). Our review is two-fold. First, we determine whether there was or was not a

genuine dispute of material fact on the summary judgment record. *Hill v. Cross Country Settlements, LLC,* 402 Md. 281, 294, 936 A.2d 343 (2007). A material fact is a fact that, if found one way or the other, will affect the outcome of the case. *Miller v. Bay City Property Owners Ass'n,* 393 Md. 620, 631, 903 A.2d 938 (2006). Second, if there is no genuine dispute of material fact, we determine whether the party that obtained summary judgment was entitled to judgment in its favor, as a matter of law. *Crickenberger, supra,* 404 Md. at 45, 944 A.2d 1136.

## DISCUSSION

### I.

### *Lemon Law Claim*

The Maryland Lemon Law defines the "manufacturer's warranty period" as "the earlier of: (i) The period of the motor vehicle's first 15,000 miles of operation; or (ii) 15 months following the date of original delivery of the motor vehicle to the consumer." CL § 14–1501(e).[3] The manufacturer's "warranties," as covered by the Lemon Law, are defined as those established in CL sections 2–312 (warranty of title), 2–313 (express warranty), 2–314 (implied warranty of merchantability), and 2–315 (implied warranty of fitness for a particular use). CL § 14–1501(g). A "consumer" includes the purchaser (other than for purposes of resale) of a new motor vehicle and any person to whom a new motor vehicle is transferred during the duration of the applicable warranty. CL § 14 –1501(b).

The operative section of the Lemon Law for our purposes is CL section 14–1502, "**Automobile warranty enforcement.**" That statute contains two primary subsections that are mutu-

---

**3.** Pursuant to 2005 Laws of Maryland, ch. 25, § 13, various subsections of CL § 14–1501 were re-designated without substantive change. Thus, the same substantive law was in effect at the time the alleged cause of action accrued. Throughout this opinion we refer to the current version of the statute.

ally exclusive. Subsection (b) is entitled *"Correction of defects."* It provides that, after timely written notice by the consumer of a "nonconformity, defect, or condition" covered by warranty, the consumer shall provide the manufacturer (or factory branch, its agent, or its authorized dealer) an opportunity to cure. CL § 14–1502(b)(1) and (2). Thereafter, the manufacturer "shall correct the nonconformity, defect, or condition at no charge to the consumer, even if repairs are made after the expiration of the warranty period." CL § 14–1502(b)(3). "The corrections shall be completed within 30 days" of the manufacturer's receipt of the consumer's notice. *Id.*

Subsection (c) of CL section 14–1502 is entitled *"Uncorrectable defects."* It covers the situation in which, during the warranty period, the manufacturer is "unable to repair or correct any defect or condition that substantially impairs the use and market value of the motor vehicle to the consumer after a reasonable number of attempts." In that case, at the consumer's option the motor vehicle shall be replaced with a comparable one or accepted for return with a refund of the entire purchase price (minus certain specified exceptions). CL § 14–1502(c). The manufacturer may raise as an affirmative defense that the "nonconformity, defect, or condition" "[d]oes not substantially impair the use and market value of the motor vehicle" or "[i]s the result of abuse, neglect, or unauthorized modifications or alterations" of the vehicle. CL § 14–1502(c)(3)(i) and (ii).

With respect to subsection (c)'s reference to "reasonable number of attempts" to "repair or correct any defect or condition that substantially impairs the use and market value" of the vehicle, subsection (d) creates (in relevant part) an evidentiary presumption that a reasonable number of attempts has been undertaken if "[t]he same nonconformity, defect, or condition has been subject to repair 4 or more times by the manufacturer ... within the warranty period but such nonconformity, defect, or condition continues to exist." CL § 14–1502(d)(1).

In *Murphy v. 24th Street Cadillac Corp.*, 353 Md. 480, 727 A.2d 915 (1999), the Court of Appeals discussed these Lemon Law provisions in the course of addressing questions arising under identical provisions of the Consumer Motor Vehicle Leasing Contracts Act, CL § 14–2001, *et seq.* (the "Leasing Contracts Act"). The Court observed:

> The [L]emon [L]aw remedies for purchases and leases of defective vehicles differentiate between curable defects and those that cannot be repaired. In the case of curable defects, the [consumer] is required to allow "an opportunity . . . to cure . . . at no charge to the [consumer]." *Thus, for defects that can be cured, [the Leasing Contracts Act] simply requires that the defect be cured free of charge by the manufacturer, dealer, or [seller].*
>
> *Subsection 14–2004(d) [of the Leasing Contracts Act] provides for those situations in which the defect is not subject to correction or remains unrepaired.* To take advantage of this subsection, the [consumer] must demonstrate two elements in addition to the existence of a nonconformity or defect and the notice required. . . . *First, the defect must be one that "the manufacturer . . . is unable to repair or correct . . . after a reasonable number of attempts." Second, the defect must be one "that substantially impairs the use and market value of the motor vehicle to the [consumer]."* If these two facts are proven, the [consumer] is entitled to choose between two remedies-either replacement of the defective vehicle with a comparable vehicle or a return of the vehicle with a refund. . . .

353 Md. at 489, 727 A.2d 915 (emphasis added) (further citations to the Leasing Contracts Act omitted).

In *Evans v. General Motors Corp.*, 459 F.Supp.2d 407 (D.Md.2006), the federal district court reviewed and summarized the remedies afforded Maryland consumers by the Lemon Law. The court explained that, "[i]n a case where a vehicle repurchase is sought"—that is, under CL section 14–1502(c)—

> · *the plaintiffs bear the burden of proving several elements, including the existence of an incurable defect.* In *Murphy*

[, *supra*, 353 Md. at 489, 727 A.2d 915], the Court of Appeals of Maryland interpreted the statute to require (1) the existence of a defect, (2) the defect must be one that the manufacturer is unable to fix after a reasonable number of attempts, and (3) the defect must be one that substantially interferes with the use and market value of the vehicle.

459 F.Supp.2d at 412 (emphasis added).

In the case at bar, it is undisputed that the Verona reached 15,000 miles on its odometer sometime after January 17, 2005, and before May 5, 2005, which was less than 15 months after delivery. Accordingly, the car was covered by the Lemon Law warranty enforcement provisions from the date of purchase, on July 17, 2004, to the date it reached 15,000 miles.

In granting summary judgment in favor of Suzuki on the Lemon Law claim, the circuit court concluded that there was no genuine dispute of material fact as to whether there existed a present, incurable defect, condition, or nonconformity in the Verona. The Zitterbarts' own evidence (Mr. Ruch's report) showed that there was no defect (incurable or not) in the car's powertrain as of the date he test drove it (March 5, 2007). In Mr. Ruch's words, the powertrain "appeared to be operating as designed." Suzuki's expert had opined that, as of the date he test drove the vehicle (February 8, 2007), it had no defect, condition, or nonconformity whatsoever.

 Mrs. Zitterbart's attestation, by affidavit, that the vehicle currently was experiencing a "hesitation problem" was not admissible evidence of a defect, condition, or nonconformity that needed to be repaired or was not reparable. Any such evidence would have to be established by expert testimony. *See Laing v. Volkswagen of America, Inc.*, 180 Md.App. 136, 163–64, 949 A.2d 26 (2008) (consumer's complaint alone that car had "hesitation problem" was insufficient without support of expert testimony to prove a defect); *see also Crickenberger, supra*, 404 Md. at 52–53, 944 A.2d 1136. The court determined, "[T]o successfully assert a Lemon Law claim, all of the statutory conditions must be met, and in this case, [the

Zitterbarts] ha[ve] not set forth facts demonstrating that the vehicle is currently defective."

On appeal, the Zitterbarts contend the court erred in granting summary judgment for Suzuki on the Lemon Law claim for several reasons, not all of which bear a logical relationship to each other, but which we shall attempt to organize by their relationship to the remedies set forth in CL sections 14–1502(b) and (c). Before doing so, we shall summarize the essential opinions given by Mr. Ruch in his March 6, 2007 report.

According to Mr. Ruch, the service visits of November 15, 2004, November 22, 2004, and January 17, 2005, were the first, second, and third "repair attempt[s] performed under warranty on the vehicle's powertrain defects." He does not identify or describe what the "powertrain defects" are. With respect to the May 5, 2005 visit (at which the Verona had over 15,000 miles on its odometer), Mr. Ruch lists the Zitterbarts' complaint as "[v]ehicle has a hesitation and loss of power while driving—Technician verified the condition and replaced the vehicle's fuel filter." He observes that the technician's comment "blam[es] the vehicle's powertrain defect on contaminated fuel" as a " 'scapegoat' for the vehicle's real powertrain defect that they [sic] could not diagnosis [sic]." He opines: "By this time [May 5, 2005], Ms. Zitterbart's new Suzuki had been presented to the authorized Suzuki repair facility four (4) times for the same defect that continued to exist." Again, the "powertrain defect" is not described.

Mr. Ruch goes on to describe the visits of July 8, July 11, and July 29, 2005, as the fifth, sixth, and seventh "repair attempt[s]" on the vehicle's "powertrain defects." Based upon his review of the servicing documents, he opines:

> The warranty repair history of this vehicle paints a clear picture that the powertrain system defect that this vehicle was sold with was not properly diagnosed by the authorized Suzuki repair facility. By this time [July 29, 2005], the subject vehicle had been returned seven (7) times for the same defect and has been out of service almost one month.

Mr. Ruch states that one purpose of his inspection of the Verona "was to confirm the condition of the vehicle and/or its current defects"; and (as we have noted), during the inspection and test drive, "the vehicle's powertrain system appeared to be operating as designed." He reports speaking to Mrs. Zitterbart about any "current concerns" and her responding that the vehicle "will hesitate at times and is actually scheduled for repairs." [4] Mr. Ruch did not report experiencing any hesitation problem with the Verona during his test drive. Mr. Ruch reasons that the good condition of the vehicle at the time of his test drive, including the absence of any powertrain problem, means that the previously existing powertrain defect in the vehicle must have been present when the vehicle was sold by Suzuki.

The remainder of Mr. Ruch's report sets forth his opinion that the market value of the Suzuki has been impaired.

The Zitterbarts make the following arguments. First, "undisputed evidence" established that the Verona "went unrepaired for at least eight and a half months," *i.e.,* from November 15, 2004, through July 29, 2005, during which time it was taken to the dealer seven times "for repairs for the same problem." Therefore, the Zitterbarts assert, their evidence on the summary judgment record showed that Suzuki did not comply with the requirement of CL section 14–1502(b)(3), that corrections be completed within 30 days of the consumer's giving notice of the defect, condition, or nonconformity needing repair or replacement.

Second, whether the number of repair attempts undertaken by Suzuki was reasonable is a question of fact and there is a genuine dispute "as to whether the presumption [in CL section 14–1502(d) ] that the engine defects were uncorrectable arises in [this] case...." Moreover, even if the presumption does not arise, there is a genuine dispute of material fact as to

---

**4.** The record does not include any servicing documents after July 29, 2005.

whether the number of repair attempts made was "sufficient to invoke" the remedies in CL section 14–1502(c).

In their third argument, the Zitterbarts assert that there are genuine disputes of material fact as to whether the Verona was completely repaired and as to whether it lost value "in fact and in relation to the price paid" by them and their "reasonable expectations."

Fourth, the Zitterbarts maintain that, even if there is not a genuine dispute of material fact as to whether the Verona was fully repaired so that it has no existing incurable defect, condition, or nonconformity, they nevertheless are entitled to recover under the Lemon Law as long as the vehicle was subject to repair at least four times and the defective condition still was not corrected after the fourth repair attempt. In other words, to recover under CL section 14–1502(c), one need not show that the vehicle in question has a current or incurable defect, and the court erred in ruling to the contrary.

Fifth, the Zitterbarts assert that the court erred in ruling that a specific "defect" must be shown, because the language of the Lemon Law refers to "nonconformity, defect, or condition"—not just "defect." And, finally, they maintain that there is a genuine dispute of material fact as to the existence *vel non* of a non-conformity that "substantially impairs the value [of the vehicle] to the buyer."

We find no merit in any of these arguments.

As the Court of Appeals in *Murphy* (interpreting identical provisions in the Leasing Contracts Act) and the federal district court in *Evans* explained, the type of remedy the Lemon Law grants a consumer who satisfies the statutory requirements depends upon whether relief is sought under CL section 14–1502(b), when the defect, condition, or nonconformity in the motor vehicle is "correctable," or under CL section 14–1502(c), when the defect, condition, or nonconformity in the motor vehicle is "uncorrectable." The consumer's remedy when a defect, condition, or nonconformity is correctable is correction of the defect by the manufacturer at no cost to the consumer. CL § 14–1502(b). The consumer's remedy when a

defect, condition, or nonconformity is uncorrectable includes replacement or repurchase of the vehicle by the manufacturer. CL § 14–1502(c).

In advancing their Lemon Law arguments, the Zitterbarts conflate the provisions of CL section 14–1502(b) and (c), as if they are interchangeable. Clearly, they are not. We shall address the various arguments put forth by the Zitterbarts in the context of the statutory subsections to which they apply, in reverse order.

### (i)

### *Replacement/repurchase remedy in CL section 14–1502(c)*

The Zitterbarts maintain they are entitled to the extraordinary repurchase remedy in CL section 14–1502(c) regardless of whether, as of the time of the summary judgment hearing, the Verona still had the defect, condition, or non-conformity for which it previously had been presented on multiple occasions for repair, during the applicable 15,000–mile Lemon Law period. They posit that, under that subsection, they could make out a *prima facie* case merely by showing that the Verona was presented for repair for the same problem a reasonable number of times and, after that reasonable number of times, the same problem persisted—even if, eventually, before summary judgment or trial, the problem no longer existed (and not because it was corrected). Thus, it mattered not that they lacked admissible evidence of a defect, condition, or non-conformity in the Verona when Mr. Ruch inspected the vehicle, on March 5, 2007. It was sufficient that they had presented the vehicle for repair a reasonable number of times (which they argue is four presumptively, or three, based upon the facts in the summary judgment record) and that the same defect, condition, or non-conformity remained *after* the last of those reasonable repair presentations.

This interpretation of the repurchase remedy provision of the Lemon Law does not comport with the plain language of CL section 14–1502(c) or the interpretation of the statutory language by the Court of Appeals in *Murphy,* and subsequent-

ly by the federal district court in *Evans*. To the extent the Zitterbarts were seeking the repurchase remedy afforded by that subsection, they had to be ready to introduce admissible evidence that, after a reasonable number of repair attempts, 1) the Verona continued to have an uncorrectable defect, condition, or nonconformity and 2) that uncorrectable defect, condition, or nonconformity substantially impaired its use and market value.

■ Mr. Ruch did not opine that the Verona had any present defect, let alone an uncorrectable defect. (Nor did he opine that the Verona had a present condition or nonconformity that is not correctable.) His conclusory references to "powertrain defects," without any factual identification or description of the alleged defects, is legally insufficient to permit a trier-of-fact to find an uncorrectable defect in the Suzuki. The documents for the three service visits during the Lemon Law period—those on November 15 and 22, 2004, and January 17, 2005—state only that the check engine light had come on and off (at times staying on); that, prior to the first visit, the vehicle was "spitting and sputtering"; and that on January 17, when the Zitterbarts reported that the check engine light was coming on and off, a split vacuum hose was replaced.

Mr. Ruch does not opine what, if any, "powertrain defect" was evidenced by one episode of "spitting and sputtering" and by the car's check engine light going on and off. A "powertrain" is "a train of gears and shafting transmitting power from an engine, motor, etc., to a mechanism [here a car] being driven." RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY, 1058 (1995). *See also* MERRIAM WEBSTER'S COLLEGIATE DICTIONARY, 974 (11th ed.2003) "the intervening mechanism by which power is transmitted from an engine to a propeller or axle that it drives; also: this mechanism plus the engine (*powertrain warranty*)." (Emphasis in original.) Indeed, the list in the written "Powertrain Limited Warranty" of "what is covered" states:

### Engine

Engine cylinder block and head(s) and all internal parts, intake manifold, timing gears, chains, tensioners and timing cover, flywheel/drive plate, valve covers, oil pan, oil pump, engine mounts, water pump, fuel pump, seals and gaskets.

### Transaxle, Transmission and Transfer Case

Transaxle, transmission, transfer case and all internal parts, torque converter, transmission/transfer case, mounts, transmission control module, seals and gaskets.

### Front Wheel Drive System

Front drive housing and all internal parts, axle shaft, drive/prop shaft, universal joints, CV joints where CV boots are intact, hubs, bearings and seals.

### Rear Wheel Drive System

Rear drive housing and all internal parts, axle shaft, drive/prop shaft, universal joints, CV joints where CV boots are intact, hubs, bearings and seals.

Nothing in Mr. Ruch's report says anything specific with respect to any of these parts. It merely translates an *experience* (spitting and sputtering and check engine light off and on) into what possibly could be a *symptom* of what possibly could be a *defect, condition, or nonconformity* of some part or parts of the *engine, transmission, and drive systems.* Mr. Ruch's opinions, as stated in his report and subsequently in his affidavit, were legally insufficient to prove that there is or ever was a defect, condition, or nonconformity in the vehicle that was "uncorrectable."

Moreover, the court properly ruled that Mrs. Zitterbart's March 5, 2007 attestation by affidavit that the Verona still was "hesitating" was not legally admissible evidence of a defect, condition, or nonconformity of the car, past or present. Mrs. Zitterbart is a layperson with no expertise in motor vehicle mechanics. The existence of a defect, condition, or nonconformity in the Verona is a matter within the specialized

knowledge of experts in the field of motor vehicle mechanics, and is not something she is qualified to offer an opinion about. *See Crickenberger, supra,* 404 Md. at 53, 944 A.2d 1136 (consumer complaint of operating problems without support of expert testimony is "mere speculation" of a mechanical defect); *Laing, supra,* 180 Md.App. at 163–64, 949 A.2d 26 (same).

In support of the motion for summary judgment, Suzuki's expert opined that the Verona has no present defect. Thus, on the summary judgment record, the circuit court was not presented with any admissible evidence to show that the Verona, at any point in time, had an uncorrectable defect. Moreover, to the extent that the Zitterbarts argue that the Lemon Law, as written, covers non-conformities and conditions, as well as defects, there was no admissible evidence presented on the summary judgment record that would meet those criteria. Accordingly, on the summary judgment record, the Zitterbarts did not adduce admissible evidence that would afford them any remedy under CL section 14–1502(c).[5]

The argument that there is a genuine dispute of material fact about whether the Verona was completely repaired fails for the same reason. Alleging that a defect, condition, or non-conformity of a vehicle was not completely repaired is no different, in this context, than alleging that the vehicle still has

---

5. The Zitterbarts cite to *DiVigenze v. Chrysler Corp.,* 345 N.J.Super. 314, 328–29, 785 A.2d 37 (App.Div.2001) and *Matter of DaimlerChrysler Corp. v. Spitzer,* 7 N.Y.3d 653, 662, 827 N.Y.S.2d 88, 860 N.E.2d 705 (2006), for the proposition that a consumer bringing suit under New York or New Jersey lemon laws is not required to prove that the same defect persisted until trial, because a contrary ruling would place the consumer in the position of either seeking a satisfactory repair or maintaining a potentially unsafe or useless vehicle in order to preserve the right to bring a claim. These rulings, which overlook the plain language of the word "continues," as it appears in CL section 14–1502(d), and in comparable provisions of those states' laws, have no application to the Zitterbarts' claim, in any event. As discussed previously, the Zitterbarts failed to offer sufficient proof that a defect or non-conformity that was not corrected timely *ever* existed, let alone existed on the date of the summary judgment hearing.

a non-conformity, defect, or condition. The Zitterbarts did not present admissible evidence of either.

Furthermore, any genuine dispute of material fact over whether Suzuki made a reasonable number of attempts to repair the Verona, and whether the presumption, in CL section 14–1502(d), applies in this case does not concern a material fact. Whether a reasonable number of attempts at repair has been undertaken is relevant only to an "uncorrectable defect" replacement/repurchase remedy under CL section 14–1502(c). Only that subsection makes reference to the phrase "reasonable number of attempts," which subsequently is described in subsection (d). Subsection (c) does not apply in this case, however, for the reason we have explained: there is no admissible evidence of the same uncorrectable defect, condition, or nonconformity in the Verona. Thus, it matters not whether a reasonable number of attempts to repair were made.

### (ii)

### *Correction remedy in CL section 14–1502(b)*

 Seemingly invoking CL section 14–1502(b), the Zitterbarts maintain that, to the extent there was a defect, condition, or nonconformity in their Verona that ultimately *was* corrected, it was not corrected for "at least eight and a half months," and therefore Suzuki violated the requirement in subsection (b)(3) that corrections be completed within 30 days of the manufacturer's receiving notice from the consumer. This argument fails for many of the same reasons we have discussed above.

Mr. Ruch's report does not contain a legally sufficient expert opinion that, during the applicable 15,000–mile Lemon Law period in this case, or at any time, there was a defect, condition, or nonconformity in the Verona that was not corrected within 30 days. As we have explained, his report does not identify any such defect, condition, or nonconformity. It states in conclusory terms that the vehicle had a long-term "powertrain defect" without identifying the defect. Moreover,

Mr. Ruch's reasoning as to why there once was a "powertrain defect" in the Verona is completely circular. He posits that, because he found, upon test driving the Verona, no evidence of a current powertrain defect, the powertrain defect *that once had existed* must have been present when the vehicle first was built, and therefore during the Lemon Law warranty period. Without threshold admissible evidence that a powertrain defect *ever existed* in the Verona, however, Mr. Ruch cannot bootstrap his finding that there was no defect at the time of his test drive into a finding that there once was a defect that eventually was cured, but not within the appropriate 30-day period in CL section 14–1502(b). Whether the Lemon Law covers "defects" only, or also "conditions or nonconformities," is not material, as the Zitterbarts did not forecast admissible evidence of a present or past defect, condition or nonconformity lasting longer than 30 days in their opposition to Suzuki's summary judgment motion.

In short, without admissible evidence that the Suzuki ever had a defect, condition, or nonconformity that was not corrected within 30 days after notice to Suzuki during the pertinent Lemon Law period, the Zitterbarts lacked foundational evidence to prove a violation of CL section 14–1502(b).

### (iii)

For the reasons we have explained, the court did not err in granting summary judgment in favor of Suzuki on the MCPA claim, either. Under CL section 14–1504(a), a violation of the Lemon Law "shall be an unfair and deceptive trade practice under Title 13 of this article." The court properly found that the Zitterbarts could not make out a *prima facie* case of violation of the Lemon Law. Accordingly, their derivative MCPA claim could not stand.

## II.

### *MMWIA Claim*

The Zitterbarts also contend that the circuit court erred in granting summary judgment in favor of Suzuki on

their MMWIA claim. The disposition of this issue is governed by *Crickenberger v. Hyundai Motor America, supra,* and *Laing v. Volkswagen, supra.* Those cases clearly hold that, when a consumer is the beneficiary of a limited warranty, as the warranties in this case were, an MMWIA claim merely is a means for the consumer to pursue the substantive warranty remedies in the Maryland Commercial Code. *See* CL §§ 2–313 (express warranty), 2–314 (implied warranty of merchantability), and 2–315 (implied warranty of fitness for a particular use). Absent a full warranty, a cause of action under the MMWIA cannot be based upon any of its substantive provisions. *Laing,* supra, 180 Md.App. at 154–56, 949 A.2d 26.

■ As Judge Harrell made clear for the Court in *Crickenberger,* to prevail in an MMWIA claim based upon a limited warranty, the consumer must prove the three "product litigation basics": the existence of a defect in the product when it left the control of the manufacturer; attribution of the defect to the manufacturer; and damage caused by the defect. 404 Md. at 49–50, 944 A.2d 1136.

■ For the reasons we already have explained, on summary judgment, the Zitterbarts did not forecast evidence of the existence of a defect in the Verona at any time, including when it left Suzuki's control. Without evidence of a defect, there can be no evidence attributing the defect to Suzuki when the car left its control, and there further can be no evidence of an injury caused by the defect. The Zitterbarts did not present the court, in opposition to the summary judgment motion, with any admissible evidence that could support a state warranty claim under any of the statutes recited above. Accordingly, the court properly granted summary judgment on the MMWIA claim.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY THE APPELLANTS.**