13 A.3d 812

David J. BONFIGLIO, et al.

v.

John J. FITZGERALD, Jr.

No. 2059, Sept. Term, 2009.

Court of Special Appeals of Maryland.

Feb. 7, 2011.

328

Michael F. Dolan, Jr. (Furey, Doolan & Abell, LLP, on the brief), Chevy Chase, for appellant.

Hadrian Hatfield (Shulman, Rogers, Gandal, Pordy & Ecker, PA, on the brief), Potomac, for appellee.

Panel: DEBORAH S. EYLER, WOODWARD and JAMES P. SALMON (Retired, Specially Assigned), JJ.

EYLER, DEBORAH S., J.

On October 12, 2007, John J. Fitzgerald ("Fitzgerald"), the appellee, was divorced from Lori F. Fitzgerald ("Lori Fitzgerald" or "the Decedent") in the Circuit Court for Montgomery County. A Marital Settlement Agreement ("the Agreement") was incorporated, but not merged, into the parties' judgment of absolute divorce. In the Agreement, Fitzgerald granted Lori Fitzgerald his entire interest in his National Automobile Dealers and Associates Retirement Trust ("NADART") Master Salary Deferral 401(k) Plan ("Plan") ("NADART Account") calculated as of the date of the Agreement. On October 19, 2007, a Qualified Domestic Relations Order ("QDRO") was entered by the court to accomplish the transfer of the interest in the NADART Account.

On December 7, 2007, the Plan paid Fitzgerald $64,802.06 as the required minimum distribution for the 2007 calendar year ("2007 RMD").[1] Three days later, on December 10, 2007, Lori Fitzgerald died suddenly. Thereafter, Fitzgerald served the QDRO on the Plan and, in March or April of 2008, the QDRO was approved by the Plan.

David Bonfiglio and Beth Core, the appellants, are Co–Personal Representatives of the Estate of Lori F. Fitzgerald ("the Estate"). They filed a petition in the circuit court seeking to compel Fitzgerald to reimburse the Estate for the amount of the 2007 RMD, to hold him in contempt for his failure to do so, and for attorneys' fees. Fitzgerald answered and filed a motion for summary judgment. The Estate then filed a cross-motion for summary judgment. After hearing argument, the

---

1. Of the $64,802.06, $12,960.41 was paid directly to the Internal Revenue Service ("IRS").

circuit court granted summary judgment in favor of Fitzgerald.

The Estate appeals, posing four questions for review, which we have condensed and rephrased as two: [2]

I.   Did the circuit court err in granting summary judgment in favor of Fitzgerald upon a legal finding that the 2007 RMD was not part of Fitzgerald's interest in the NADART Account when the Agreement and the QDRO were executed?

II.  Did the circuit court err in denying the Estate's request for attorneys' fees?

For the following reasons, we shall affirm the judgment of the circuit court.

## FACTS AND PROCEEDINGS

Fitzgerald and the Decedent were married on November 3, 1990. They separated on January 1, 2006. On August 18,

---

**2.** As worded by the Estate, the questions presented are:

I.   Whether the trial court erred as a matter of law in finding that Fitzgerald was not obligated to reimburse the Estate the amount of a required minimum distribution made to Fitzgerald on December 7, 2007 from the NADART Account where both the parties' Agreement, dated October 11, 2007 and the trial court's QDRO, dated October 12, 2007, both of which were incorporated but not merged into the Judgment of Absolute Divorce, dated October 19, 2007, already had transferred and assigned Fitzgerald's entire interest in that retirement plan as of October 12, 2007 to Decedent?

II.  Whether the trial court erred as a matter of law in granting summary judgment in Fitzgerald's favor based upon its consideration of and reliance upon purported "expert" legal opinions provided in the affidavit of a certified public accountant and unsworn communications of the retirement plan's administrator?

III. Whether the trial court erred as a matter of law in granting summary judgment in Fitzgerald's favor based upon its conclusion that applicable pension and tax laws precluded Fitzgerald from reimbursing the Estate the amount of a required minimum distribution made to Fitzgerald on December 7, 2007 from the NADART Account?

IV.  Whether the trial court erred as a matter of law by failing to enter summary judgment in the Estate's favor and awarding it reasonable attorneys' fees and costs incurred in seeking reimbursement of the required minimum distribution from Fitzgerald?

2006, in the Circuit Court for Montgomery County, the Decedent filed a complaint for absolute divorce. Fitzgerald and the Decedent entered into the Agreement on October 11, 2007. The Agreement included a draft QDRO.

On October 12, 2007, the court granted the parties an absolute divorce. The judgment was entered on October 19, 2007. It provided, in pertinent part, that the parties' Agreement was "incorporated but not merged" into the judgment and that the court would reserve jurisdiction over the matter "for the receipt, entry, alteration and/or amendment by this Court of any appropriate Order(s) pertaining to retirement benefits."

The Agreement included a section entitled "Retirement Assets," which provided, in relevant part:

**11. Retirement Assets—Definitions**

The following definitions shall be controlling for the purposes of this Agreement:

\* \* \*

"Right or benefit" shall include, but not be limited to, the right either party may have, whether as a participant or a spouse, and whether vested, contingent or unvested, to receive any benefit from a retirement asset [3], whether in the form of an annuity, lump-sum payment, death benefit, joint or survivor annuity, survivorship interest, pre-retirement survivor annuity, return of contributions, or any other benefit or future expectancy, and whether pursuant to any State or Federal law or regulation, or pursuant to the terms of any contract or plan or beneficiary designation.

**12. Retirement Assets—General Waiver**

Except as otherwise provided in this Agreement, each party hereby expressly waives and surrenders any and all interest, right or benefit they may have as a spouse, whether legal, beneficial, or equitable, to or arising from any

---

**3.** The term "Retirement Asset" was defined elsewhere in the Agreement to include a 401(k) plan such as the NADART Account.

interest, right or benefit the other may have in any Retirement Asset. . . . .

**13. NADART 401(k)**

The Husband hereby agrees and acknowledges that he has an interest in a NADART 401(k) account ("401(k) Plan") with an approximate value of One Million Seven Hundred Fourteen Thousand Dollars ($1,714,000.00). *The Husband agrees to transfer and assign to the Wife his entire interest in the 401(k) Plan, calculated as of the date of this Agreement or the most recent plan valuation date prior to such date, together with any earnings or losses thereon until the date of distribution to the Wife.* The parties agree that their Judgment of Divorce shall be accompanied by a QDRO in compliance with Section 414(p) of the Internal Revenue Code of 1986, as amended [ ("IRC") ], and Section 206(d)(3) of the Employee Security Act of 1974, as amended [ ("ERISA") ], for the purpose of transferring to the Wife 100% of the Husband's 401(k) Plan calculated as of the date of this Agreement or the most recent plan valuation date prior to such date, together with any earnings or losses thereon until the date of distribution. (QDRO attached as Exhibit E.) Upon distribution, all interest in this Retirement Asset transferred and assigned to Wife shall be the sole and exclusive separate property of the Wife. After distribution all interest in this Retirement Asset remaining to Husband shall be the sole and exclusive separate property of the Husband. The Husband shall not be responsible for any delays from causes beyond his control.

(Emphasis added.)

The QDRO attached to the Agreement was signed by the court the same day and, like the judgment of absolute divorce, was entered on October 19, 2007. Its recitals provided that the parties intended the QDRO to be "as defined in Section 414(p) of the [IRC] and Section 206(d) of [ERISA], which assigns certain benefits in the [NADART Plan] as specifically set forth in the Order." At Paragraph 1, the QDRO defined "Participant" to mean Fitzgerald and "Alternate Payee" to mean the Decedent. At Paragraph 3, it stated:

The Alternate Payee's interest in the Plan is to be determined as follows: **Alternate Payee is awarded the Participant's entire plan account balance as of October 12, 2007, together with any earnings or losses thereon until the date of distribution, as her sole and separate property.** The benefit amount shall be prorated among the investments under the Plan in such proportions as the benefit amount shall bear the market value of each investment on the valuation date of October 12, 2007. The balance of the funds in the Plan are to be the sole and separate property of the Participant.

The value of the Participant's account balance under this Plan shall be determined in accordance with the terms of this Order as of the Valuation Date, or, if the value of the Participant's account balance under the Plan is not subject to valuation under the terms of the Plan as of the Valuation Date, then such value shall be determined as of the immediately preceding valuation date provided under the Plan.

As soon as administratively feasible after the approval of this Order as a QDRO, the amount assigned by this Paragraph 3 from the Participant to the Alternate Payee shall be withdrawn from the Participant's account and invested in a separate account in the same manner as the Participant's account unless or until the Alternate Payee elects a different investment option under the Plan that is maintained for the benefit of the Alternate Payee.

(Emphasis added.)

At Paragraph 12, the QDRO states, in relevant part:

Reimbursement. If benefits assigned to the Alternate Payee under this Order are wrongfully or mistakenly paid by the Plan to the Participant, the Participant shall promptly reimburse the Alternate Payee for such benefits by paying directly to the Alternate Payee an amount equal to the benefits wrongfully or mistakenly received.

Less than two months after entry of the Agreement and the QDRO, on December 7, 2007, the Plan distributed to Fitzgerald the 2007 RMD in the amount of $64,802.06. As noted,

*supra,* 20% of this amount ($12,960.41) was paid directly to the IRS. As of the date of this payment, the Plan had not yet been served with a copy of the QDRO.

The QDRO was served on the Plan at some time in March of 2008 and was approved on or about April 1, 2008. Thereafter, the Plan distributed to the Estate the then-existing balance of the NADART Account, less the value of shares purchased by Fitzgerald after October 12, 2007.[4] The total amount distributed to the Estate was $1,520,519,46.

On June 17, 2008, counsel for the Estate made written demand upon Fitzgerald to reimburse the Estate for the 2007 RMD (and certain other amounts not relevant to this appeal). No reimbursement was forthcoming.

On January 28, 2009, the Estate filed a "Verified Petition For An Order to Show Cause Why [Fitzgerald] Should Not Be Held In Contempt And For Enforcement Of [the Agreement] And [QDRO]" ("Verified Petition"). In the Verified Petition, the Estate alleged that the 2007 RMD had been wrongfully or mistakenly paid to Fitzgerald, and that, pursuant to Paragraph 12 of the QDRO, he was obligated to promptly reimburse the Estate for the amount of the 2007 RMD, which he had not done. The Estate sought reimbursement, contempt, and an award of attorneys' fees. Attached to the Verified Petition were copies of the Agreement, the QDRO, and the demand letter.

On March 30, 2009, Fitzgerald answered the Verified Petition and filed a motion for summary judgment. He argued that "[b]y law, the [2007] RMD belonged to [him] separate, distinct, and apart from his interest in the NADART 401(k)" and so was not part of the interest transferred to the Decedent by the Agreement and QDRO. Attached to his motion were three exhibits. Exhibit A consisted of two letters to counsel for Fitzgerald from Alan B. Svedlow, QKA,[5] the

---

**4.** Those shares were valued at $400.

**5.** QKA means "Qualified 401(k) Administrator."

NADART Compliance Officer. The first letter, dated April 1, 2008, detailed the distribution to be made to the Estate and described the 2007 RMD as an "amount ineligible to be awarded to Lori F. Fitzgerald." The second letter, dated June 19, 2008, explained, in greater detail, that the 2007 RMD was based on the NADART Account balance as of December 31, 2006, and had to be paid by December 31, 2007, but that the date of payment was irrelevant "with respect to ownership."

Exhibit B was an affidavit by Walter C. Pennington, CPA, opining that "the position taken by NADART was correct; namely that the [2007 RMD], was separate, distinct and severable from Mr. Fitzgerald's interest in the NADART [Account] at the time the [ ] Agreement was signed." According to Pennington, once Fitzgerald "lived one day into calendar year 2007" (*i.e.*, as of January 1, 2007), an RMD was required to be made in that calendar year and he was "the one required to receive the distribution." If the Plan had distributed this amount to the Estate, it would have violated the governing provisions of ERISA and the IRC, according to Pennington, potentially disqualifying the entire Plan.

Exhibit C was a letter from Svedlow to Bonfiglio, dated April 1, 2008, discussing the NADART Account; the potential beneficiaries of the NADART Account; and options for distribution of the balance of the account depending upon who was named as the beneficiary.[6]

On April 14, 2009, the Estate filed an opposition to the motion for summary judgment, a cross-motion for summary judgment, and a motion to strike the exhibits to Fitzgerald's motion.

On August 5, 2009, the circuit court heard argument on the summary judgment motions. The court issued a memorandum opinion granting Fitzgerald's motion and denying the

---

**6.** The Decedent's mother and her three siblings all were living at the time of her death. Under the Plan rules, the Decedent's mother was the priority beneficiary. She could disclaim her interest in favor of the Decedent's siblings, however.

Estate's cross-motion and Verified Petition on October 6, 2009. The court framed the legal issue as follows: "whether the [2007] RMD payment constituted part of [Fitzgerald]'s interest in the NADART 401(k) Plan on October 12, 2007." The court concluded that, reading the Agreement and the QDRO in conjunction with the pertinent portions of the IRC and ERISA, Fitzgerald "complied with the Agreement and QDRO fully [and] that the [2007] RMD payment funds were not a part of [Fitzgerald's] interest on October 12, 2007."

The court quoted at length from the Pennington affidavit, ultimately concluding that the 2007 RMD payment was required to be made to Fitzgerald for the Plan to remain qualified under the IRC and ERISA. Ultimately, the court concluded that "as a matter of law that [the 2007 RMD payment was] not mistakenly paid to [Fitzgerald] and he is not required under law, or agreement to reimburse the Decedent['s] estate for those funds."

The Estate timely appealed the circuit court's judgment.

## STANDARD OF REVIEW

■ We review a circuit court's decision to grant summary judgment *de novo*. *Crickenberger v. Hyundai Motor America*, 404 Md. 37, 45, 944 A.2d 1136 (2008). Our review is two-fold. First, we determine whether there was or was not a genuine dispute of material fact on the summary judgment record. *Hill v. Cross Country Settlements, LLC*, 402 Md. 281, 294, 936 A.2d 343 (2007). A material fact is a fact that, if found one way or the other, will affect the outcome of the case. *Miller v. Bay City Property Owners Ass'n*, 393 Md. 620, 631, 903 A.2d 938 (2006). Second, if there is no genuine dispute of material fact, we determine whether the party that obtained summary judgment was entitled to judgment in its favor, as a matter of law. *Crickenberger, supra*, 404 Md. at 45, 944 A.2d 1136.

*Zitterbart v. Am. Suzuki Motor Corp.*, 182 Md.App. 495, 501–02, 958 A.2d 372, *cert. denied*, 406 Md. 581, 961 A.2d 555 (2008).

## DISCUSSION

### I.

The Estate advances several related arguments to support its contention that the circuit court erred in ruling that the Decedent was not entitled to reimbursement in the amount of the 2007 RMD. It first asserts that the circuit court "ignored the express terms" of the Agreement and the QDRO in concluding that the 2007 RMD was not part of Fitzgerald's interest in the NADART Account that was transferred to the Decedent by means of the Agreement and the QDRO. It further argues that governing pension and tax law allows for an RMD payment to be made to an "Alternate Payee," such as the Decedent, under a QDRO. The Estate also argues that the circuit court erred in relying upon the Pennington affidavit and in denying the motion to strike that affidavit (as well as the letters by Svedlow).[7]

Fitzgerald responds that the circuit court correctly concluded, as a matter of law, that the 2007 RMD only was payable to him, as the Plan "Participant," and that it was not a part of his interest in the NADART Account when the Agreement and QDRO were executed. He asserts that, because the 2007 RMD could not have been assigned to the Decedent in the first place, he was not required by the Agreement or the QDRO to reimburse the Estate for the amount of the 2007 RMD.

Pursuant to 26 U.S.C.A section 401(a)(9)(A) (2002) (hereinafter "IRC"), entitled "Required Distributions," for a 401(k) plan to be a qualified plan under the IRC it must

... provide[ ] that the entire interest of each employee—

---

**7.** The docket entries reflect that the motion was found to be "moot." Because we shall address and resolve the legal issues *de novo* without relying upon the exhibits, we need not determine whether the exhibits properly could have been considered as part of the summary judgment record. For the same reason, any error on the circuit court's part in relying upon the exhibits was not prejudicial.

(i) will be distributed to such employee not later than the required beginning date, or

(ii) will be distributed, beginning not later than the required beginning date, in accordance with regulations, over the life of such employee or over the lives of such employee and a designated beneficiary (or over a period not extending beyond the life expectancy of such employee or the life expectancy of such employee and a designated beneficiary).

The term "required beginning date" is defined as "April 1 of the calendar year following the later of—(I) the calendar year in which the employee attains age 70½, or (II) the calendar year in which the employee retires." IRC § 401(a)(9)(C). The amount of each required distribution typically is calculated by dividing the balance of the retirement plan by the life expectancy of the participant.[8] Thus, the minimum distribution rules are designed to ensure that plan participants over 70 will receive, and pay taxes upon, at least a portion of their retirement assets during their lifetimes.

In the instant case, Fitzgerald turned 70½ in calendar year 2006. In compliance with IRC section 401(a)(9), the Plan was obligated to make its first RMD payment to him by April 1, 2007. It did so on March 9, 2007. This RMD was calculated based upon the NADART Account value as of December 31, 2005. 26 C.F.R. 1.401(a)(9)–5 A–3.(a) (2010). There is no dispute that the 2006 RMD payment properly was paid to Fitzgerald.

As we shall discuss, in calendar year 2007—the year at issue in the instant appeal—the Plan was obligated to make an RMD payment after January 1, 2007, but no later than December 31, 2007. This RMD was based upon the NADART Account value as of December 31, 2006. *Id.* The 2007 RMD

---

8. Tables with estimated life expectancies are set forth at 26 C.F.R. 1.401(a)(9)–9. In some cases, the participant may combine his or her life expectancy with the life expectancy of his or her spouse or other sole beneficiary of the plan, thus increasing the denominator in the fractional equation and reducing the amount that is required to be distributed.

was paid to Fitzgerald on December 7, 2007, just under two months after Fitzgerald and the Decedent executed the Agreement. The two primary issues on appeal are whether the 2007 RMD payment was part of the interest assigned by Fitzgerald to the Decedent by virtue of the Agreement and the QDRO and, relatedly, whether the Plan "wrongfully or mistakenly" distributed the 2007 RMD to Fitzgerald, requiring his reimbursement of that amount to the Estate pursuant to the terms of the QDRO.

We begin with the express terms of the Agreement and the QDRO describing the interest in the NADART Account that was to be conveyed to the Decedent. Pursuant to the Agreement, Fitzgerald agreed to assign to the Decedent "his entire interest in the 401(k) Plan, calculated as of the date of this Agreement or the most recent plan valuation date prior to such date, together with any earnings or losses thereon until the date of distribution to the Wife." The Agreement further provided that an attached QDRO "in compliance with Section 414(p) of the [IRC] and Section 206(d)(3) of the [ERISA] would accomplish the assignment. Specifically, the QDRO would transfer to the [D]ecedent "100% of the Husband's 401(k) Plan calculated as of the date of this Agreement or the most recent plan valuation date prior to such date, together with any earnings or losses thereon until the date of distribution." After the Decedent's interest was distributed to her, "all interest in [the NADART Account] remaining" would be "the sole and exclusive separate property" of Fitzgerald.

The QDRO defined the Decedent's interest in the NADART Account as follows: "Alternate Payee is awarded the Participant's entire plan account balance as of October 12, 2007, together with any earnings or losses thereon until the date of distribution, as her sole and separate property." The account balance would be determined

in accordance with the terms of this Order as of the Valuation Date, or, if the value of the Participant's account balance under the Plan is not subject to valuation under the terms of the Plan as of the Valuation Date, then such value

shall be determined as of the immediately preceding valuation date provided under the Plan.

Thus, under the Agreement, the Decedent was awarded Fitzgerald's "entire interest" in the NADART Account and the parties agreed that an attached QDRO would transfer this "entire interest" to the Decedent. Under the express terms of the QDRO, that entire interest was the "entire plan account balance as of October 12, 2007." Because the 2007 RMD had not yet been distributed by that date, it was part of the "entire plan account balance" as of that date.[9]

The Agreement required, however, that the QDRO be in compliance with the IRC and ERISA. In reliance on this language, Fitzgerald argues, as he did below, that the Agreement and QDRO could not effectuate an assignment of the 2007 RMD to the Decedent because, as of January 1, 2007, that sum was earmarked as a distribution to Fitzgerald and therefore was not part of his interest in the NADART Account; and a QDRO purporting to convey an interest in an RMD that had become payable prior to the date of execution of a marital settlement agreement would not be in compliance with the IRC, as the IRC requires that such a payment be made only to the plan participant. The Estate disagrees, asserting that nothing in the IRC or ERISA prohibits such an assignment and, in fact, the IRC regulations specifically contemplate the assignment of an RMD to an alternate payee, such as the Decedent, under a QDRO.

■ The IRC and ERISA generally prohibit the alienation or assignment of plan benefits under a qualified plan. *See* IRC § 401(a)(13)(A) ("A trust shall not constitute a qualified trust under this section unless the plan of which such trust is a part provides that benefits provided under the plan may not be assigned or alienated."); 29 U.S.C.A. § 1056(d)(1) (2009)

---

9. As Fitzgerald's counsel explained during argument on the cross-motions for summary judgment, plan administrators routinely delay making payment of an RMD precisely because allowing the RMD amount to remain part of the plan balance will allow it to "continue to grow tax free before making the distribution."

("Each pension plan shall provide that benefits provided under the plan may not be assigned or alienated"). A QDRO is exempted from that general prohibition, however. Specifically, IRC section 401(a)(13)(B) provides:

> (B) **Special rules for domestic relations orders.** Subparagraph (A) shall apply to the creation, assignment, or recognition of a right to any benefit payable with respect to a participant pursuant to a domestic relations order, *except that subparagraph (A) shall not apply if the order is determined to be a qualified domestic relations order.*

(Emphasis added.) Thus, a QDRO may assign "benefits provided under" a qualified plan, such as the NADART Account in the instant case.

IRC section 414(p)(1)(A) defines a QDRO as

a domestic relations order—

> (i) which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan, and

> (ii) with respect to which the requirements of paragraphs (2) and (3) are met.

Paragraph (2) of that section requires that a domestic relations order contain certain information about the alternate payee and the portion of the benefits assigned to the alternate payee. Paragraph (3) imposes three additional requirements for a domestic relations order to be qualified:

A domestic relations order meets the requirements of this paragraph only if such order—

> (A) *does not require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan,*

> (B) does not require the plan to provide increased benefits (determined on the basis of actuarial value), and

> (C) does not require the payment of benefits to an alternate payee which are required to be paid to another alter-

nate payee under another order previously determined to be a qualified domestic relations order.

IRC § 414(p)(3). (Emphasis added.)

■ Treasury Regulation 26 C.F.R. 1.401(a)(9) sets forth the specifics, partly in question and answer form, of how, when, and to whom required minimum distributions must be made. As pertinent here, when the status of a plan participant is such that a minimum distribution is required (for instance, as here, the plan participant has reached the age of 70½), and the plan participant is alive for any part of the distribution year, the minimum distribution is required. In other words, if the plan participant is alive on January 1 of a distribution year, the required minimum distribution for that year must be made, even if the plan participant dies on January 2. 26 C.F.R. 1.401(a)(9)–5 A–4.(a). The required minimum distribution thus is incurred as of January 1 of any distribution year in which the plan participant is alive. The distribution actually may be paid during any part of that same year, however. So, while the required minimum distribution will have been incurred on January 1 of the given distribution year, it may be paid as late as December 31 of that year. 26 C.F.R. 1.401(a)(9)–5 A–1.(c). The regulation further provides that the required minimum distribution must be paid to the plan participant, if he is alive, or, if not, to his beneficiary. 26 C.F.R. 1.401(a)(9)–5 A–4.(a).

■ This regulation makes plain that 1) the 2007 RMD for Fitzgerald was incurred on January 1, 2007; 2) so long as Fitzgerald was alive during that year, payment of the 2007 RMD had to be made to him, and only to him; and 3) the 2007 RMD, while incurred on January 1, 2007, could be paid to Fitzgerald as late as December 31, 2007. Thus, before the Fitzgeralds entered into the Agreement and before the judgment of absolute divorce and QDRO were issued, the 2007 RMD had been incurred and was payable to Fitzgerald and only to him (unless he died during that year, which did not happen).

Pointing to the language in IRC section 414(p)(3)(A) that a QDRO may not "require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan," Fitzgerald maintains that any purported assignment, under the QDRO, of the 2007 RMD to the Decedent would have required the Plan to provide to the Decedent a benefit not allowed for under the Plan. He directs us to 26 C.F.R. 1.401(a)(9)–1, which sets forth the following question and answer:

Q–3. What specific provisions must a plan contain in order to satisfy [IRC section] 401(a)(9)?

A–3. (a) *Required provisions.* In order to satisfy section 401(a)(9), the plan must include the provisions described in this paragraph reflecting section 401(a)(9). First, the plan must generally set forth the statutory rules of section 401(a)(9), including the incidental death benefit requirement in section 401(a)(9)(G). Second, the plan must provide that distributions will be made in accordance with this section and §§ 1.401(a)(9)–2 through 1.401(a)(9)–9. *The plan document must also provide that the provisions reflecting section 401(a)(9) override any distribution options in the plan inconsistent with section 401(a)(9).* The plan also must include any other provisions reflecting section 401(a)(9) that are prescribed by the Commissioner in revenue rulings, notices, and other guidance published in the Internal Revenue Bulletin. See § 601.601(d)(2)(ii)(b) of this chapter.

(Emphasis added.)

We agree with Fitzgerald that the italicized portion of the Treasury Regulation makes clear that the required distribution rules preempt any other rules to the contrary and that, by extension, a QDRO could not grant a benefit to an alternate payee inconsistent with these rules.

■ The Estate asserts, however, that IRC section 414(p)(10), entitled "Waiver of certain distribution requirements," permits the payment, under a QDRO, of an RMD to the transferee under the QDRO, and that the only reason the 2007 RMD was not paid to the Decedent, as the transferee

under the Agreement and the QDRO, was that the QDRO was not delivered to the Plan administrator before December 7, 2007 (the date on which the 2007 RMD actually was paid to Fitzgerald).

The IRC section in question states:

> With respect to the requirements of **subsections (a)** and (k) **of [IRC] section 401,** section 403(b), section 409(d), and section 457(d), **a plan shall not be treated as failing to meet such requirements solely by reason of payments to an alternative payee pursuant to a qualified domestic relations order.**

IRC § 414(p)(10). (Emphasis added.) The Treasury Regulation to IRC section 401(a)(9), requiring minimum distributions, similarly states this rule:

> A plan will not fail to satisfy section 401(a)(9) merely because it fails to distribute an amount otherwise required to be distributed by section 401(a)(9) during the period in which the issue of whether a domestic relations order is a QDRO is being determined pursuant to section 414(p)(7), provided that the period does not extend beyond the 18–month period described in section 414(p)(7)(E). . . .

26 C.F.R. 1.401(a)(9)–8 A–7.

As noted, the Estate asserts that these exceptions govern in the instant case and permitted the 2007 RMD to be assigned to the Decedent. Fitzgerald responds that the exceptions to the minimum distribution rules apply only when a QDRO transferring an interest in a qualified plan is entered by the court *before* the start of the calendar year in which the RMD is incurred. Because the 2007 RMD was incurred by him on January 1, 2007, ten months before the Agreement and QDRO were entered, the exceptions do not apply. Fitzgerald does not dispute—and indeed agrees—that the 2008 RMD was subject to these exceptions. That RMD was incurred on January 1, 2008, almost three months after the Agreement and QDRO were entered, and about two and a half months before the QDRO was approved. (In fact, in the instant case,

the 2008 RMD was held in abeyance pending qualification of the QDRO.)

We agree with Fitzgerald that the 2007 RMD did not fall within the exceptions created by IRC section 414(p)(10) and 26 C.F.R. 1.401(a)(9)–8 A–7 and could not have been properly included in Fitzgerald's interest in the NADART Account as of October 12, 2007. Reading the relevant IRC sections and the Treasury Regulations as a whole, it is apparent that the exceptions are intended to apply when an RMD is triggered *after entry* of a domestic relations order assigning an interest in a plan to an alternate payee, but before the qualification of that order. In the instant case, the 2007 RMD was incurred ten months before the QDRO was entered. As of January 1, 2007, the 2007 RMD became payable to Fitzgerald; and the Plan became obligated to make the payment, to him, any time prior to December 31, 2007. In other words, the timing of the 2007 RMD was within the Plan's discretion, but the recipient was not. While the actual sum of the 2007 RMD technically remained a part of the NADART Account balance during the eleven months prior to its distribution, it was no longer part of Fitzgerald's interest in the account. Neither the Agreement nor the QDRO could effect a transfer of the 2007 RMD to the Decedent.

The Estate's argument that, had the QDRO been timely served on the NADART Plan administrators, the Plan would have withheld the 2007 RMD pending qualification, lacks merit. As we have explained, the timing of receipt of the QDRO was irrelevant to the disposition of the 2007 RMD. Nothing in the QDRO affected the fact that Fitzgerald was the Plan "Participant" on January 1, 2007, and that he was the only person with any interest in the account as of that date.

Because we have determined that the 2007 RMD was not part of Fitzgerald's interest in the NADART Account as of the date the Agreement and the QDRO were entered, we also conclude that the 2007 RMD was not "wrongfully or mistakenly paid by the Plan" to Fitzgerald. To the contrary, under the provisions of the controlling law, the 2007 RMD only was

payable to Fitzgerald (unless he died during 2007, in which case it only would have been payable to his beneficiary under the Plan). Therefore, Fitzgerald had no obligation to reimburse the Estate for the amount of the 2007 RMD under Paragraph 12 of the QDRO. Nor did any other part of the Agreement or QDRO create any obligation on Fitzgerald's part to pay the Decedent an amount equal to the 2007 RMD.

## II.

In light of our answer to question I, we necessarily conclude that there was no error in the circuit court's denial of the Estate's request for attorneys' fees.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**

